**REVISED April 11, 2017**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

No. 16-20046

United States Court of Appeals
Fifth Circuit

**FILED**

March 16, 2017

Lyle W. Cayce
Clerk

STREAMLINE PRODUCTION SYSTEMS, INC.,

     Plaintiff - Appellee

v.

STREAMLINE MANUFACTURING, INC.,

     Defendant - Appellant

Appeal from the United States District Court
for the Southern District of Texas

Before STEWART, Chief Judge, and KING and DENNIS, Circuit Judges.

KING, Circuit Judge:

Streamline Production Systems, Inc. filed this trademark infringement suit against Streamline Manufacturing, Inc. seeking damages under the Lanham Act and Texas common law. After stipulating to an injunction, the parties proceeded to a jury trial on the issues of infringement and damages. The jury returned a verdict finding that Streamline Manufacturing, Inc. infringed on Streamline Production Systems, Inc.'s valid trademark in its name and awarded damages for lost royalties, unjust enrichment, and exemplary damages, each in the sum of $230,000, for a total award of $690,000.

The district court denied Streamline Manufacturing Inc.'s motion for judgment as a matter of law, as well as its renewed motion for judgment as a matter of law, or in the alternative, for a new trial. Finding insufficient evidence to support the damages awards, we AFFIRM the jury's finding of trademark infringement but VACATE the damages awards.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Facts

Plaintiff–Appellee Streamline Production Systems, Inc. (SPSI) was established in 1993 by Michael Renick in Beaumont, Texas. SPSI initially began as an oilfield services company. In 1997, SPSI began custom fabricating pressure vessels, and today, it produces a range of custom fabricated natural gas processing equipment, such as gas separators, heat exchangers, re-boilers, and pressure vessels, and sells that equipment to customers nationwide, in addition to continuing to provide oilfield services and repair. Later on, Renick founded three other companies that all use "Streamline" in their names and share staff with and operate in the same region as SPSI but do not manufacture custom fabricated natural gas processing equipment. SPSI's 2013 sales exceeded $27 million. According to Renick, his company has been successful over the years because it is "well-known in the oil field."

SPSI's logo consists of the word "Streamline" written on a ring encircling the image of a piece of natural gas production equipment. SPSI includes this logo, along with its phone number, on a metal placard that it attaches to each piece of equipment it produces. SPSI also uses this logo for its advertising, which includes printed brochures, branded merchandise, branded racecars, and a website. SPSI's current website is streamlinetexas.com. The website's color scheme is blue and white. The banner at the top of the website depicts "Streamline Production Systems" written in white lettering and integrated with a piece of natural gas production equipment against a blue background.

Prior to operating its website at this URL, SPSI operated a website at the URL streamlinetx.com, which, according to SPSI's business manager, was "very generic" and was not relied upon for business.

Defendant–Appellant Streamline Manufacturing, Inc. (SMI) was founded in 2009 in Houston by Luis Morales and Bob Tulio. SMI also fabricates natural gas processing equipment, including pressure vessels, boilers, heat exchangers, skids, and separators, and sells them to customers nationwide. But unlike SPSI, it does not do any oil field servicing or repair work. SMI also attaches a placard to each piece of equipment it produces identifying SMI as the manufacturer, but unlike SPSI's placard, it does not include SMI's phone number. Both Morales and Tulio worked at another oil and gas equipment manufacturing company, RCH Industries, before they founded SMI. Initially, all of SMI's business came from customers with whom Morales and Tulio had preexisting relationships through their prior work at RCH Industries, and those customers have continued to comprise the majority of SMI's business. Some of these customers are equipment resellers who sell SMI's equipment to end-market users. Relying on this customer base, SMI reached over $1 million in sales in its first full year of business, and between 2009 and 2014, it had over $20 million in total sales.

According to Morales and Tulio, they selected the name "Streamline Manufacturing, Inc." for their new company after conferring with family members and "bouncing names around," with the goal of "trying to find something short" and "not[] confusing." They sought a name with a three letter acronym because that was how their previous company (RCH) was referred to and because they thought such a concise name "denote[d] efficiency." They brainstormed several possible names that they "pull[ed] . . . out of the air," one of which was "Streamline Manufacturing, Inc." They provided these possible names to their lawyer so he could check the availability of the names with the

Texas Secretary of State, and SMI showed as available, so it was chosen. In choosing this name, Morales and Tulio professed to be entirely unaware of SPSI's name, location, degree of success, customers, and even its mere existence; nor did they know Renick. After choosing SMI as a name, Morales sought to establish a website. He used a commercial website to search available domain names, and the search indicated that his first choice for a domain name, SMI.com, was not available. Morales then searched for "Streamline," and streamline.com was also not available, but the search provided a drop down box indicating several other available variations. Morales picked the shortest available variation shown in the drop down box, streamlinetx.com, as SMI's website domain name. This was the same domain name previously used by SPSI. SMI's website was predominantly blue and white in color scheme, and its homepage displayed SMI's logo: "SMI" in blue font against a background of a photo of natural gas equipment overlaid against an outline of the state of Texas. Besides this website, SMI did not engage in any advertising or marketing efforts and did not even have a sign outside its office.

Around 2011, SPSI began to learn of SMI's existence. First, it attempted to update its website but learned that its registration had lapsed and that SMI had taken over the domain. It also began to encounter customers and vendors who confused SPSI and SMI. In 2012, Renick learned that one of SPSI's oil field services customers, Century Exploration, had a piece of equipment manufactured by SMI that it mistakenly believed it had purchased from SPSI. Another customer, Union Services, mistakenly sent a $130 check intended for SPSI to SMI instead. Renick also received a call from a purchasing agent at Pioneer Resources, a natural gas company, who said he had a pressure vessel with a "Streamline" placard on it but no phone number and he was interested in purchasing more. It became clear that the purchasing agent was an SMI

customer, had an SMI-manufactured vessel, and had erroneously called SPSI. According to Renick, SPSI's vendors also occasionally erroneously shipped equipment to SMI's offices. And two vendors refused to sell equipment and materials to SPSI because they confused it with SMI, who had unpaid bills. Despite these instances of confusion, SPSI did not contact SMI.

At the same time SPSI was learning of SMI's existence, SMI was also learning of SPSI. In 2011, a representative from the Texas Secretary of State called SMI seeking to collect franchise taxes owed by SPSI. In addition, a third-party insurance inspector mentioned to Morales that he knew of another company called "Streamline." SMI also received at least one phone call intended for SPSI. And in 2013, an employee at one of SMI's customers, Mustang, told Morales that there was another business called "Streamline" in Texas but it is not clear that he mentioned what type of work it did. SMI did not investigate SPSI after any of these instances of confusion. Tulio explained that at first he thought SPSI was a movie production business due to the presence of "production" in its name. He also justified his lack of concern over the confusion based on the fact that SMI did not "run into" SPSI.

In February 2013, Renick submitted an application to the United States Patent and Trademark Office (PTO) for trademark registration of the mark "Streamline Production Systems," and the PTO issued the trademark for this phrase on October 29, 2013. On November 26, 2013, SPSI sent a cease and desist letter to SMI, demanding that SMI "immediately cease and desist the use, display, and distribution of any materials bearing the phrase STREAMLINE MANUFACTURING." The letter stated that SPSI was the holder of the common law, state, and federal trademark in Streamline Production Systems and that SMI's use of "Streamline Manufacturing" infringed on SPSI's trademark because it was "highly similar in look, sound, and connotation" and used in conjunction with similar goods and services.

5

SMI's counsel responded in a letter on January 14, 2014, disclaiming any infringement of SPSI's trademark. In March 2014, Renick signed an agreement with SPSI assigning his "entire right, title and interest in and to" his trademark in "Streamline Production Systems" to SPSI.

## B. Proceedings

On May 9, 2014, SPSI filed suit against SMI, alleging, in relevant part, infringement of its trademark under the Lanham Act and Texas common law and seeking damages as well as injunctive relief. In its answer, SMI denied all claims.[1] Nevertheless, SMI ultimately stipulated to a preliminary injunction on August 28, 2014. Pursuant to the injunction, SMI agreed to, within 120 days, change its name and discontinue all use of "Streamline Manufacturing" on its marketing and communications materials, and within 30 days, discontinue its use of the domain name "streamlinetx.com." SMI eventually changed its name to Strongfab Solutions, Inc. SPSI's suit proceeded to a five-day jury trial on the issues of trademark infringement and damages, commencing on November 16, 2015. The jury heard testimony from SMI's and SPSI's principals, SPSI's damages expert, and two representatives of companies that were customers of SMI. At the conclusion of SPSI's case, SMI moved for a directed verdict on SPSI's common law trademark infringement claim, arguing that SPSI had not demonstrated any actual damages, which the district court denied. At the conclusion of all testimony, SMI moved for judgment as a matter of law (JMOL) on all of SPSI's claims, which the district court also denied. The jury was given a lengthy jury charge outlining the burden of proof on each verdict question and the elements of each claim.[2]

---

[1] SMI also asserted the affirmative defenses of waiver and laches.

[2] SMI objected to many aspects of this jury charge, but these objections were overruled for the most part and are not at issue in this appeal.

The jury returned its verdict on November 23, 2015. The jury found that SPSI proved by a preponderance of the evidence that SPSI had a valid trademark under the Lanham Act and Texas common law in "Streamline Production Systems" and that SMI had infringed on this trademark.[3] The jury further found that this infringement was the proximate cause of damages to SPSI. However, the jury found that SPSI failed to prove it was entitled to any profit that SMI had earned that was "directly attributable" to its infringing use of the trademarks and that SMI had earned "zero" profit through its infringing use of the trademarks. Nevertheless, the jury awarded SPSI $230,000 as a "reasonable royalty" for SMI's use of the trademark, another $230,000 for unjust enrichment to SMI through its infringing use, and a final $230,000 as exemplary damages, for a total damages award of $690,000.

The district court entered a final judgment in the case on November 24, 2015. SMI then filed a renewed JMOL motion, or in the alternative, a motion for new trial. SMI argued it was entitled to JMOL, in relevant part, on (1) the trademark infringement claims, (2) the claim for unjust enrichment, and (3) the jury's finding that SMI's infringement was done with "malice, gross negligence, willfulness, or willful blindness" and its corresponding finding that SPSI was thus entitled to exemplary damages. The district court denied this motion without explanation. SMI timely appealed.

## II. TRADEMARK INFRINGEMENT

SMI appeals the district court's denial of its renewed motion for JMOL, or in the alternative, a new trial on the issue of trademark infringement. We review the denial of a renewed JMOL motion de novo, applying the same

---

[3] The jury also found that SMI had failed to prove its affirmative defenses of laches and waiver.

standard in reviewing the motion as the district court.[4] *Cowart v. Erwin*, 837 F.3d 444, 450 (5th Cir. 2016). "When a case is tried to a jury, a [JMOL] motion . . . 'is a challenge to the legal sufficiency of the evidence supporting the jury's verdict.'" *Id.* (quoting *Heck v. Triche*, 775 F.3d 265, 272 (5th Cir. 2014)). In reviewing a challenge to a jury verdict, "we draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the [verdict]." *Id.* (quoting *Heck*, 775 F.3d at 273). The motion should be denied "unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Id.* (quoting *Heck*, 775 F.3d at 273).

We review the district court's denial of a motion for a new trial for abuse of discretion. *Id.* "The district court abuses its discretion by denying a new trial only when there is an 'absolute absence of evidence to support the jury's verdict.'" *Cobb v. Rowan Cos.*, 919 F.2d 1089, 1090 (5th Cir. 1991) (quoting *Irvan v. Frozen Food Express, Inc.*, 809 F.2d 1165, 1166 (5th Cir. 1987)). When the district court has denied, rather than granted, such a motion, "[o]ur review is particularly limited" and we affirm the denial "unless the evidence—viewed in the light most favorable to the jury's verdict—points so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary [conclusion]." *Cowart*, 837 F.3d at 450 (alterations in original) (quoting *Alaniz v. Zamora–Quezada*, 591 F.3d 761, 770 (5th Cir. 2009)).

SPSI brought its trademark infringement claim under both the Lanham Act, 15 U.S.C. § 1114, and Texas common law,[5] and the parties agreed in their

---

[4] We apply the same standard when reviewing a renewed JMOL motion as we do in reviewing a JMOL motion. *See Foradori v. Harris*, 523 F.3d 477, 485 n.8 (5th Cir. 2008).

[5] The jury was instructed on two "Streamline Production Systems" marks, one under common law and the other under federal law as a federally registered trademark. Because these two marks are identical and the standard for infringement is the same for each, we consider them as one single mark.

joint pretrial order that both governed the trademark infringement claim. To prevail on its claim of trademark infringement under the Lanham Act, SPSI must show two elements: (1) it possesses a legally protectable trademark and (2) SMI's use of this trademark "creates a likelihood of confusion as to source, affiliation, or sponsorship." *Nola Spice Designs, L.L.C. v. Haydel Enters., Inc.,* 783 F.3d 527, 536 (5th Cir. 2015). The elements of common law trademark infringement under Texas law are the same as those under the Lanham Act. *Hot-Hed, Inc. v. Safehouse Habitats (Scotland), Ltd.,* 333 S.W.3d 719, 730 (Tex. App.—Houston [1st Dist.] 2010, pet. denied). We consider the evidence on both of these elements in turn.

## A. Possession of a legally protectable trademark

SMI argues that no reasonable juror could have found that "Streamline Production Systems" was a legally protectable trademark. The Lanham Act defines a trademark as "any word, name, symbol, or device, or combination thereof" that is used "to identify and distinguish . . . goods . . . from those manufactured or sold by others and to indicate the source of the goods." 15 U.S.C. § 1127. "To be legally protectable, a mark must be 'distinctive' in one of two ways": (1) inherent distinctiveness or (2) acquired distinctiveness through secondary meaning. *Nola Spice Designs,* 783 F.3d at 537 (citing *Am. Rice, Inc. v. Producers Rice Mill, Inc.,* 518 F.3d 321, 329 (5th Cir. 2008)). Registration of a mark with the PTO is "prima facie evidence that the mark[] [is] inherently distinctive." *Id.* But this evidence can be rebutted "by demonstrating that the mark[] [is] not inherently distinctive," *id.*, and if so, we cancel the trademark registration, *Xtreme Lashes, LLC v. Xtended Beauty, Inc.,* 576 F.3d 221, 232 (5th Cir. 2009).

To assess the distinctiveness of a word mark, as opposed to a design mark, we "rel[y] on the spectrum set forth by Judge Friendly in *Abercrombie & Fitch Co. v. Hunting World Inc.,* 537 F.2d 4, 9 (2d Cir. 1976)." *Nola Spice*

*Designs*, 783 F.3d at 537. This spectrum divides the distinctiveness of marks into five categories: "(1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful."[6] *Id.* The latter three categories are inherently distinctive, whereas generic marks cannot be distinctive and "descriptive marks are distinctive only if they have acquired 'secondary meaning.'" *Id.* In categorizing a mark, we "examine the context in which it is used," including "'how [the term] is used with other words,' 'the products or services to which it is applied,' and 'the audience to which the relevant product or service is directed.'" *Id.* (alteration in original) (emphasis omitted) (quoting *Union Nat'l Bank of Tex., Laredo v. Union Nat'l Bank of Tex., Austin*, 909 F.2d 839, 847 (5th Cir. 1990)). We ask: What do the buyers understand by the term? *Id.* at 537–38. When evaluating a multi-word mark, such as "Streamline Production Systems," we consider the mark "as a unitary whole in its given arrangement, and do not parse apart the constituent terms." *Xtreme Lashes*, 576 F.3d at 232.

The jury found that SPSI's mark, "Streamline Production Systems" is "suggestive, arbitrary, or fanciful." Because it made this finding, it did not reach the question of whether the mark had achieved secondary meaning. SMI argues that the mark is merely descriptive and has not acquired secondary meaning, and thus is not sufficiently distinctive to warrant trademark protection. SPSI counters that its mark is, at minimum, suggestive and, even if it is merely descriptive, it has acquired secondary meaning and is thus sufficiently distinctive to warrant trademark protection. Since the question of whether SPSI's mark is legally protectable depends on whether it is descriptive (receiving no trademark protection unless it has secondary meaning) or

---

[6] As noted in *Nola Spice Designs*, the Third Circuit has provided the following helpful examples of each mark, "(1) arbitrary or fanciful (such as 'KODAK'); (2) suggestive (such as 'COPPERTONE'); (3) descriptive (such as 'SECURITY CENTER'); and (4) generic (such as 'DIET CHOCOLATE FUDGE SODA')." 783 F.3d at 537 n.2 (quoting *Freedom Card, Inc. v. JPMorgan Chase & Co.*, 432 F.2d 463, 472 (3d Cir. 2005)).

suggestive (receiving trademark protection), *Nola Spice Designs*, 783 F.3d at 537, our analysis will focus on these two categories of distinctiveness.

"A *descriptive* term identifies a characteristic or quality of an article or service, such as its color, odor, function, dimensions, or ingredients." *Id.* at 539 (quoting *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 241 (5th Cir. 2010)). "Thus, in many cases, a descriptive term will be an adjective such as 'speedy,' 'friendly,' 'green,' 'menthol,' or 'reliable.'" *Union Nat'l Bank*, 909 F.2d at 845. "Examples of descriptive marks would include Alo with reference to products containing gel of the aloe vera plant and Vision Center in reference to a business offering optical goods and services." *Nola Spice Designs*, 783 F.3d at 539 (quoting *Amazing Spaces*, 608 F.3d at 241). We have previously recognized that "[d]escriptiveness is construed broadly." *Xtreme Lashes*, 576 F.3d at 232.

In contrast, a suggestive term "'suggests, rather than describes,' some characteristic of the goods to which it . . . applie[s] and requires the consumer to exercise his imagination to reach a conclusion as to the nature of those goods." *Soweco, Inc. v. Shell Oil Co.*, 617 F.2d 1178, 1184 (5th Cir. 1980) (quoting *Vision Center v. Opticks, Inc.*, 596 F.2d 111, 115–16 (5th Cir. 1979)). Examples of suggestive terms include "Penguin" for a refrigerator brand, *id.*, and "Coppertone" for sun tanning products, *Zatarains, Inc. v. Oak Grove Smokehouse, Inc.*, 698 F.2d 786, 791 (5th Cir. 1983), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc.*, 543 U.S. 111 (2004).

One test that we employ to distinguish between descriptive and suggestive terms is the "'imagination test,' which 'seeks to measure the relationship between the actual words of the mark and the product to which they are applied." *Nola Spice Designs*, 783 F.3d at 539 (quoting *Zatarains*, 698 F.2d at 792). "If a word requires imagination to apply it to the product or

service in question, it tends to show that the term as used is suggestive. On the other hand, if the word conveys information about the product, it is descriptive." *Id.* (quoting *Union Nat'l Bank*, 909 F.2d at 848). We applied the imagination test in *Xtreme Lashes* and concluded that the district court erred in holding the mark "EXTEND YOUR BEAUTY" descriptive as a matter of law. 576 F.3d at 225, 233. In reaching this conclusion we noted that "nothing in the dictionary definition of 'extend,' 'your,' or 'beauty' relates to *eyelash* enhancements." *Id.* at 233. Rather, the mark merely referred to "beauty" in general, which was "an abstract concept." *Id.* The mark was at a sufficiently high level of generality that it required customers to "use 'imagination, thought and perception' to conclude that an exhortation to 'extend your beauty' markets *eyelash* extensions, as opposed to another cosmetically enhanced feature." *Id.* (quoting *Zatarains*, 698 F.3d at 792). We recognized that "EXTEND YOUR BEAUTY" always appeared with the company's other mark, "XTREME LASHES," and this "weigh[ed] towards descriptiveness." *Id.* But we ultimately concluded that this question of the categorization of the mark was "best weighed by a jury after a full presentment of the evidence." *Id.*

Similarly, "Streamline Production Systems" describes SPSI's products at a sufficiently high level of generality that it requires imagination on the part of customers to deduce the nature of its products. Just as with "EXTEND YOUR BEAUTY," nothing in the dictionary definitions of the words comprising SPSI's mark denotes a connection to natural gas processing equipment or even the natural gas industry in general. Although SPSI's logo, which depicts a piece of natural gas processing equipment, might make this connection more explicit, *Xtreme Lashes* recognized that the effect of the context a mark appeared in had on its categorization was best left to a jury. The jury in this case heard testimony and viewed exhibits about SPSI's logo and ultimately found as a matter of fact that the mark was, at minimum, suggestive.

SMI cites several cases from other jurisdictions and administrative agency decisions analyzing "Streamline" and similar terms (EZ FLO, Slim Line, *etc.*) in support of its argument that the mark is merely descriptive. Yet we are not writing on a blank slate. Instead, the factual question, *Xtreme Lashes*, 576 F.3d at 232, of the categorization of SPSI's mark was decided by the jury after a trial. Our review is therefore limited to assessing the sufficiency of the evidence and we must affirm the jury's verdict on this issue "unless there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Cowart*, 837 F.3d at 450 (quoting *Heck*, 775 F.3d at 273). Despite the evidence to the contrary that SMI cites, it cannot be said that the jury lacked any legally sufficient evidentiary basis for concluding that SPSI's mark was, at minimum, suggestive. The jury was instructed that descriptive marks "describe an attribute or quality of a particular product," and heard testimony that SPSI does not sell any product called a "streamline," nor does "streamline" describe any of the products SPSI sells. Given the preference we have previously expressed for having a jury decide the issue of the categorization of a mark, *Xtreme Lashes*, 576 F.3d at 225, 233, the jury's finding on this issue is supported by sufficient evidence.

## B. Likelihood of confusion

SMI next argues that, even if SPSI has a valid trademark in "Streamline Production Systems," no reasonable juror could find that SMI's use of the mark created a likelihood of confusion. The second prong of the trademark infringement test requires the claimant to show that the purported infringer's use of the mark "creates a likelihood of confusion as to source, affiliation, or sponsorship." *Nola Spice Designs*, 783 F.3d at 536. We have described likelihood of confusion as "the paramount question" in a trademark infringement action. *Xtreme Lashes*, 576 F.3d at 226. "'Likelihood of confusion' means more than a mere possibility" of confusion; rather, "the plaintiff must

demonstrate a probability of confusion." *Id.* (quoting *Bd. of Supervisors v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008)). We assess the likelihood of confusion using "a nonexhaustive list of so-called 'digits of confusion,'" which include:

> '(1) the type of mark allegedly infringed, (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, . . . (7) any evidence of actual confusion[,]' . . . [and] (8) the degree of care exercised by potential purchasers.

*Smack Apparel*, 550 F.3d at 478 (quoting *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663–64 (5th Cir. 2000)). "No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors." *Id.* "[T]he digits may weigh differently from case to case, 'depending on the particular facts and circumstances involved.'" *Xtreme Lashes*, 576 F.3d at 227 (quoting *Marathon Mfg., Co. v. Enerlite Prods. Corp.*, 767 F.2d 214, 218 (5th Cir. 1985) (per curiam)). We address the evidence presented on each of the eight digits of confusion in turn.

### 1. Type of mark

This digit of confusion refers to the strength of the mark along the generic to arbitrary distinctiveness continuum discussed above. *Id.* The more distinctive the mark, the more likely that consumers will be confused by competing uses of the mark. *Smack Apparel*, 550 F.3d at 479. Given that the jury found SPSI's mark to be, at minimum, suggestive, this digit weighs in favor of finding a likelihood of confusion. SMI attempts to avoid this conclusion, arguing that because "Streamline" is used by Renick's other three companies and is also a registered design mark of Schlumberger—another company in the oil and gas industry—the mark is weakened. Third-party use of a mark is relevant to the strength of the mark, "[b]ut the key is whether the

third-party use diminishes in the public's mind the association of the mark with [SPSI]." *Smack Apparel*, 550 F.3d at 479. Here, Renick's other three companies' use of "Streamline" does not diminish this association because the evidence showed that all three companies were owned by Renick, started after SPSI, operated out of the same office as SPSI, and shared SPSI's staff. If anything, these other companies bolster the public association between the mark and SPSI. *Cf. Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 203 (5th Cir. 1998) ("The pervasiveness of [plaintiff's] marks across the spectrum of products and [various establishments] . . . support a likelihood of confusion."). And no evidence was introduced at trial on the nature and extent of Schlumberger's use of its design mark in "Streamline." Accordingly, given the jury's finding that the mark was at least suggestive, this digit weighs in favor of finding a likelihood of confusion.

*2. Mark similarity*

Assessing the similarity of the competing marks "requires consideration of the marks' appearance, sound, and meaning." *Smack Apparel*, 550 F.3d at 479. The more similar the marks, the greater the likelihood of confusion. *Nautilus Grp., Inc. v. ICON Health & Fitness, Inc.*, 372 F.3d 1330, 1344 (Fed. Cir. 2004). "Even if two marks are distinguishable, we ask whether, under the circumstances of use, the marks are similar enough that a reasonable person could believe the two products have a common origin or association." *Xtreme Lashes*, 576 F.3d at 228. In assessing mark similarity, we "give more attention to the dominant features of a mark." *Id.* Here, giving more attention to the dominant features of the mark requires our analysis to focus on the use of "Streamline" in both marks because the additional words in each mark are more generic. In this sense, the two marks are identical. *See id.* (finding similarity where, even though the two marks did not share any common words, they had a "minor aural similarity when . . . spoken aloud"). And considering

15

the similarity of the context in which the two marks often appear—each company's logo—further weighs in favor of mark similarity. *See Smack Apparel*, 550 F.3d at 480 (considering the similarities in "design elements" such as "color schemes . . . and images" in assessing mark similarity). Both logos include the image of a piece of natural gas equipment and are blue in color scheme. This digit thus weighs in favor of finding a likelihood of confusion.

*3. Product similarity*

"The greater the similarity between the products and services, the greater the likelihood of confusion." *Xtreme Lashes*, 576 F.3d at 229 (quoting *Exxon Corp. v. Texas Motor Exch. of Hous. Inc.*, 628 F.2d 500, 505 (5th Cir. 1980)). Here, there is great similarity between the products, which SMI essentially concedes by not addressing this digit of confusion on appeal. Both SPSI and SMI manufacture custom fabricated natural gas processing equipment, including gas separators, heat exchangers, and re-boilers. Both also attach a metal placard that includes the word "Streamline" on each piece of equipment sold. This weighs in favor of finding a likelihood of confusion.

*4. Outlet and purchaser similarity*

The smaller the overlap between the retail outlets for and the predominant consumers of SPSI's and SMI's goods, the smaller the possibility of confusion. *Exxon Corp.*, 628 F.2d at 505. The jury heard testimony that SMI's customers were comprised mostly of companies with preexisting relationships with SMI's principals. SPSI's and SMI's customer lists were also introduced into evidence, and they showed, with few exceptions, no overlap between customers. However, the jury also heard testimony that some of SMI's customers are equipment resellers who sell SMI equipment to end-market users who do not appear on SMI's customer list and thus may overlap with SPSI's customers. This possibility was further underscored by testimony that two companies, Pioneer Resources and Century Exploration, were not SMI

customers yet owned SMI-manufactured equipment. In *Xtreme Lashes*, we explained that if a company sells to resellers, that "may increase the likelihood of confusion" because "[b]uyers cannot 'compare the products side by side.'" 576 F.3d at 229 (quoting *Sun-Fun Prods., Inc. v. Suntan Research & Dev. Inc.*, 656 F.2d 186, 192 (5th Cir. Unit B 1981)). Due to this competing evidence (no overlap in direct customer base yet some overlap in indirect customer base), this digit of confusion is neutral on the likelihood of confusion.

5. *Advertising media identity*

"The greater the similarity in the [advertising] campaigns, the greater the likelihood of confusion." *Exxon Corp.*, 628 F.2d at 506. The jury was presented with evidence that SPSI engages in extensive marketing efforts and uses its logo for advertising on printed brochures, branded merchandise, and branded racecars. In contrast, the evidence showed that SMI does not engage in any advertising or marketing efforts other than hosting its website and does not even have a sign outside its office. However, the jury also received evidence that SPSI's and SMI's websites had a similar color scheme and their logos had overlapping features. In addition, SMI's website was hosted at the same URL previously held by SPSI. While it is true, as SMI argues, that SPSI could have copied its website color scheme from SMI, this digit of confusion focuses on the similarity of the advertising without regard for which advertising came first. However, because the evidence demonstrates that SMI engaged in minimal advertising, this digit is "minimally probative" of likelihood of confusion. *See Smack Apparel*, 550 F.3d at 481 (concluding this digit was "minimally probative" where evidence showed that one of the companies did not advertise beyond "limited sales" from its website).

6. *SMI's intent*

"Although not necessary to a finding of likelihood of confusion, a defendant's intent to confuse may alone be sufficient to justify an inference

that there is a likelihood of confusion." *Id.* Our intent inquiry focuses on whether the defendant intended to derive benefits from the reputation of the plaintiff. *Sicilia Di. R. Biebow & Co. v. Cox*, 732 F.2d 417, 431 (5th Cir. 1984), *abrogated on other grounds by TrafFix Devices v. Mktg. Displays, Inc.*, 532 U.S. 23 (2001). In some situations, the defendant's use of the mark with "knowledge" of the senior user's mark "may give rise to a presumption that the defendant intended to cause public confusion." *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 486 (5th Cir. 2004) (quoting *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 151 n.2 (5th Cir. 1985)). But "mere awareness" of the senior user's mark does not "establish[] . . . bad intent." *Conan Props.*, 752 F.2d at 150. We have looked for evidence that the defendant made efforts "to 'pass off' its product as that of [the plaintiff]" through "imitation of packaging material" or "adopting . . . similar distribution methods." *Amstar Corp v. Domino's Pizza, Inc.*, 615 F.2d 252, 263 (5th Cir. 1980). We have found an intent to confuse when the evidence indicates that the defendant, in choosing its mark, knew about the plaintiff's mark and intended to capitalize on the plaintiff's popularity. *See Smack Apparel*, 550 F.3d at 481–83; *Am. Rice*, 518 F.3d at 332–33. We have also found intent to confuse when the defendant did not choose the mark with intent to confuse but subsequently used the mark in a way that "evidenced an intent to trade on [the senior user's] reputation." *Westchester Media*, 214 F.3d at 666.

Here, the only evidence of intent to confuse identified by SPSI is SMI's conduct after learning about SPSI's existence and SMI's failure to change its name until SPSI filed suit. SPSI does not allege that SMI had bad faith in choosing its name, and indeed, the evidence was that, when choosing the name, SMI's principals were entirely unaware of SPSI's name, length of time in business, degree of success, customers, and even its mere existence; nor did they know Renick. Further, SPSI's trademark was not registered at the time

18

SMI chose its name in 2009. Rather than hearing evidence of bad faith, the jury heard extensive testimony on the innocuous reasoning behind SMI's name and the relative degree of care that Morales and Tulio exercised in selecting the name. The evidence indicated that SMI did not learn of SPSI's existence until 2011, and even then it did not know any details about SPSI's business, its location, its customers, or its degree of success; indeed, Tulio testified that, upon initially hearing SPSI's name, he thought it was the name of a movie production company. The only testimony on intent at trial was from SPSI's principals who merely stated that they had a "feeling" and a "belief" that SMI's use of the mark was intentional but admitted they could not point to any objective evidence of this intent.

Intent to confuse cannot be inferred from SMI's failure to investigate SPSI or otherwise take any action because SPSI offered no evidence that, after learning about SPSI, SMI did anything differently in an attempt to "pass off" its products as SPSI's. *Cf. Westchester Media*, 214 F.3d at 666 (concluding that while not initially chosen in bad faith, junior user's subsequent use of its mark "evidenced an intent to trade on [the senior user's] reputation"); *Amstar,* 615 F.2d at 263 (analyzing the junior user's attempt to "pass off" its products as the senior user's). We have recognized that a company may have a non-nefarious intent in using a mark with awareness of the senior user's mark. *See Scott Fetzer Co.*, 381 F.3d at 486 ("Intent to compete, however, is not tantamount to intent to confuse."). And the majority rule amongst jurisdictions is that a defendant's continued use of a mark even after it receives a cease and desist letter cannot be construed as evidence of intent to confuse. 4 J THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:120 (4th ed.). This is because "[a] party may have considered that plaintiff's contention was without a legally supportable basis and made a rational business decision to continue use until a court stated

otherwise." *Id.* Indeed, Tulio testified that SMI engaged in a cost-benefit analysis in deciding to continue using its name after receiving the letter. Thus this digit weighs against finding a likelihood of confusion.

### 7. Actual confusion

"Evidence that consumers have been actually confused in identifying the defendant's use of a mark as that of the plaintiff may be the best evidence of a likelihood of confusion." *Smack Apparel*, 550 F.3d at 483 (citing *Elvis Presley Enters.*, 141 F.3d at 203). A plaintiff may show actual confusion using anecdotal instances of consumer confusion, systematic consumer surveys, or both. *Scott Fetzer Co.*, 381 F.3d at 486. We have set a low bar for this showing, stating that a plaintiff need provide "very little proof of actual confusion . . . to prove likelihood of confusion." *Xtreme Lashes*, 576 F.3d at 229. Even if the anecdotes are minor and isolated, "courts may not ignore competent evidence of actual confusion." *Id.* at 230. Testimony of a single known incident of actual confusion by a consumer has been found to be sufficient evidence to support the district court's finding of actual confusion. *La. World Exposition v. Logue*, 746 F.2d 1033, 1041 (5th Cir. 1984). And, if the plaintiff provides proof of actual confusion, the defendant must provide "an almost overwhelming amount of proof . . . to refute such proof." *Xtreme Lashes*, 576 F.3d at 230 (quoting *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 489 (5th Cir. 1971)). However, not all confusion counts: evidence of actual confusion must show "more than a fleeting mix-up of names"; rather it must show that "[t]he confusion was caused by the trademarks employed and it swayed consumer purchases." *Xtreme Lashes*, 576 F.3d at 230. We have rejected anecdotal evidence of actual confusion when the proponent did not show that "a misleading representation by [the defendant], as opposed to some other source, caused a likelihood of confusion." *Scott Fetzer Co.*, 381 F.3d at 487.

SPSI relies on anecdotal evidence to show actual confusion. SMI argues that the "innocuous and isolated" events that SPSI offers as proof of actual confusion are insufficient to establish that a significant number of people were likely to be confused. Yet this argument confuses the standard for likelihood of confusion[7] with that for actual confusion, which requires "very little proof . . . to prove the likelihood of confusion," *Xtreme Lashes*, 576 F.3d at 229 (quoting *World Carpets*, 438 F.2d at 489), and can be supported by testimony of a single known incident of actual confusion, *La. World Exposition*, 746 F.2d at 1041 (finding testimony from an individual who bought one of the defendant's t-shirts thinking it was made by the plaintiff to be sufficient to support a showing of actual confusion). This digit can therefore weigh in favor of finding a likelihood that a significant number of people were confused even if it does not show that a significant number of people were *actually* confused. Furthermore, SPSI's examples of actual confusion satisfy the requirement that the confusion result from the mark, rather than a "fleeting mix-up of names" or some other source. *Xtreme Lashes*, 576 F.3d at 230; *see also Scott Fetzer Co.*, 381 F.3d at 487. Two of the instances of confusion were directly attributable to SMI's use of a plate on its equipment that included the word "Streamline," thus demonstrating that the mark, rather than some other source, caused the confusion.

SMI counters that there was no evidence that SPSI lost any profit from this confusion. But this fact is inapposite because we have never required a showing of lost profit to accompany instances of actual confusion; rather we merely require that the confusion "sway[] consumer purchases." *Xtreme Lashes*, 576 F.3d at 230; *see also Elvis Presley Enters.*, 141 F.3d at 204

---

[7] This standard was articulated in the jury instructions as existing "if a significant number of reasonable people are likely to be confused, mistaken, or deceived" and as being determined using the eight digits of confusion.

("Infringement can be based upon confusion that creates initial consumer interest, even though no actual sale is finally completed as a result of the confusion." (quoting 3 J THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 23:6 (4th ed. 1997))).  Finally, SMI's contention that SPSI should be faulted for failing to present testimony from any customer on actual confusion (rather than presenting secondhand accounts through Renick's testimony) is also inapposite.  We have previously rejected hearsay objections to indirect testimony about actual confusion, explaining that such evidence is not offered for the truth of the matter asserted but rather to show effect on consumers, namely, confusion.  *Armco, Inc. v. Armco Burglar Alarm Co.*, 693 F.2d 1155, 1160 & n.10 (5th Cir. 1982).  Therefore, SPSI's evidence of actual confusion is not entitled to any less weight by virtue of its source.  This digit of confusion thus weighs in favor of finding a likelihood of confusion.

    *8.  Degree of care exercised by potential purchasers*

We have framed this digit as dependent in part on the price of the item: "Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion." *Smack Apparel*, 550 F.3d at 483.  "However, a high price tag alone does not negate other [digits of confusion], especially if the goods or marks are similar." *Xtreme Lashes*, 576 F.3d at 231.  Here, the customers were oil and gas companies, and the items were relatively expensive custom fabricated natural gas processing equipment, often costing up to $100,000 per piece.  This equipment is often purchased through a fairly lengthy and involved process of communication between the buyer and seller.  As SMI notes, purchasing such equipment "is not like pulling a box of dish soap off of a shelf at a retail store."  While SPSI argues that even a $100,000 price tag may be a drop in the bucket for some large oil and gas companies, the only evidence it cites in support of this assertion is its expert's testimony that such a sum was "[n]ot necessarily" a lot of money for some

companies. Because SPSI's and SMI's customers were large companies purchasing very expensive, custom made equipment, this digit weighs against finding a likelihood of confusion. *See Oreck Corp. v. U.S. Floor Sys., Inc.*, 803 F.2d 166, 173 (5th Cir. 1986) (reasoning that because the customers were "buying for professional and institutional purposes at a cost in the thousands of dollars, they are virtually certain to be informed, deliberative buyers" and, thus, not likely to be confused).

### 9. *Weighing the digits of confusion*

Although the digits of confusion do not point in a uniform direction, at least some weigh in favor of finding a likelihood of confusion. Because there is not a complete absence of evidence to support the jury's finding that there was a likelihood of confusion—and that the mark was legally protectable—we conclude there is sufficient evidence to support the jury's finding of infringement. *See Cowart*, 837 F.3d at 450. Accordingly, the district court did not err in denying either the renewed motion for JMOL or, alternatively, a new trial.

## III. DAMAGES

SMI also appeals the district court's denial of its motion for JMOL and renewed motion for JMOL or for a new trial on the issue of damages. As previously stated, we review such a motion de novo. *Cowart*, 837 F.3d at 450. And we will reverse only in the absence of a legally sufficient evidentiary basis to support the award. *Wellogix, Inc. v. Accenture, L.L.P.*, 716 F.3d 867, 883 (5th Cir. 2013).

The Lanham Act provides remedies in the form of both injunctive relief and monetary damages for a plaintiff who proves trademark infringement. *See* 15 U.S.C. §§ 1116, 1117(a). It allows for recovery of monetary damages, "subject to the principles of equity," in the form of "(1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." *Id.*

§ 1117(a).    It instructs that such monetary damages "shall constitute compensation and not a penalty." *Id.*  We have previously noted that monetary damages are not warranted in trademark infringement cases if "[a]n injunction alone . . . fully satisfies the equities of a given case." *Seatrax, Inc. v. Sonbeck, Int'l, Inc.*, 200 F.3d 358, 369 (5th Cir. 2000) (citing *Bandag, Inc. v. Al Bolser's Tire Stores*, 750 F.2d 903, 917 (Fed. Cir. 1984)).  This is "particularly [true] in the absence of a showing of wrongful intent," *Bandag*, 750 F.2d at 917, or if there is a "lack of sufficient proof of actual damages," *Seatrax, Inc.*, 200 F.3d at 372; *see also Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 555 (5th Cir. 1998) ("Considering the lack of actual damages and the lack of an intent to confuse or deceive, injunctive relief satisfies the equities in this case."), *abrogated on other grounds by TrafFix Devices, Inc.*, 532 U.S. 23.

Here, SPSI obtained both injunctive relief and damages.  It obtained injunctive relief prior to trial, when SMI agreed to change its name, discontinue all use of "Streamline Manufacturing" on its marketing and communications materials, and discontinue its use of the domain name "streamlinetx.com" within 120 days.  SPSI also pursued monetary damages and, after a trial, the question of damages was put to the jury.  The jury found that SMI's infringement was "a proximate cause of damages" to SPSI.  Despite this, the jury declined to award damages to SPSI in the form of SMI's profits, finding that SPSI failed to prove that it was entitled to profit that SMI had earned that was "directly attributable to" SMI's infringing use and that the total profit SMI had earned through its infringing use was "zero."  But SPSI ultimately obtained three separate damages awards—not based on loss profit—from the jury: a royalty award, an unjust enrichment award, and an exemplary damages award, each in the sum of $230,000.  We review the evidentiary support for each award in turn.

## A. Royalty Award

While not explicitly provided for in the Lanham Act, we have permitted trademark infringement damages on the basis of the royalty rate normally charged for licensing the unauthorized use of the mark, on the logic that the plaintiff sustained damages equal to the profit they could have made from such a license. *See Boston Prof'l Hockey Ass'n v. Dall. Cap & Emblem Mfg., Inc.*, 597 F.2d 71, 75–76 (5th Cir. 1979). "Usually, when the courts have awarded a royalty for past acts of infringement, it was for continued use of a mark after a license ended and damages were measured by the royalty rate the parties had agreed on." *Choice Hotels Int'l, Inc. v. Patel*, 940 F. Supp. 2d 532, 546 (S.D. Tex. 2013) (Costa, J.) (quoting 5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:85 (4th ed. 2013)); *see also Brennan's Inc. v. Dickie Brennan & Co.*, 376 F.3d 356, 371 (5th Cir. 2004) (citing the same section of *McCarthy* as support for its assertion about when royalties are a proper measure of damages); *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 166 F.3d 197, 208–09 (3d Cir. 1999) ("[W]hen the courts have awarded a royalty for past trademark infringement, it was most often for continued use of a product beyond authorization, and damages were measured by the license the parties had or contemplated.").

We have infrequently addressed a royalty-based measure of damages for trademark infringement. The most instructive case on this question is *Boston Professional Hockey Ass'n v. Dallas Cap & Emblem Manufacturing, Inc.*, in which we affirmed a royalty rate as a measure of damages based on the price the defendant had offered to pay for the license (which the plaintiff rejected) before it commenced its infringing use. 597 F.2d at 75–76. However, we reduced the royalty award calculated by the district court after carefully scrutinizing the evidence of the parties' actual negotiations, reasoning that the district court had erroneously based its award on the price the defendant had

25

offered for an *exclusive* license, when the infringing use was nonexclusive because another party actually held the license. *Id.* at 76.

The Federal Circuit subsequently analyzed our holding in *Boston Professional* and interpreted it as "stand[ing] for the proposition that any royalty-based measures of damages must exhibit a strictly rational correlation between the rights appropriated and the measure of damages applied." *Bandag*, 750 F.2d at 920. It then relied on *Boston Professional* in vacating a trademark infringement royalty award, reasoning that such a rational correlation was absent because the defendant's infringement consisted of the use of the plaintiff's logo in a single advertisement. *Id.* Because the infringing use did not appropriate the full range of rights that a license bestows upon the licensee, the Federal Circuit concluded that an award based on a full royalty was not rationally correlated to the infringement. *Bandag*, 750 F.2d at 920. The court also cited the lack of evidence of wrongful intent by the defendant as well as the plaintiff's failure to show it had been actually damaged as bases for vacating the damages award. *Id.* at 920–21; *see also Patel*, 940 F. Supp. 2d at 546 (Costa, J.) (citing *Bandag*); *Holiday Inns, Inc. v. Airport Holiday Corp.*, 493 F. Supp. 1025, 1028 (N.D. Tex. 1980) (reducing the plaintiff's royalty-based damages award because 70% of room sales were due to the defendant's efforts and only 30% were due to the defendant's infringing use), *aff'd*, 683 F.2d 931 (5th Cir. 1982).

Here, there was no evidence introduced, nor did either party contend, that SPSI and SMI ever entered into, negotiated, discussed, or even contemplated a licensing agreement. Nor was there any evidence that SPSI or SMI ever engaged in such licensing negotiations with any other entity. Instead, the jury's royalty award was based on testimony by SPSI's expert witness on a "hypothetical negotiation" between the two parties. The expert testified that he calculated a reasonable royalty rate of 3–5% in this case. The

jury's award ultimately adopted a royalty rate equivalent to about 1.5% for a total award of $230,000.

SMI challenges the jury's royalty award, arguing (1) that royalty damages are not proper in this case because such awards are limited to cases where the parties had prior licensing negotiations or agreements and here there was evidence only of a hypothetical negotiation[8]; and (2) even if such an award were appropriate, SPSI failed to offer any evidence to establish a rational correlation between the rights SMI purportedly appropriated and the award. Because we conclude there is insufficient evidence to support the royalty award, we need not address whether a royalty-based award can be based on a hypothetical negotiation between the parties.

A royalty-based damages award must be rationally related to the scope of the defendant's infringement. *Boston Professional*, 597 F.2d at 75–76; *see also Bandag*, 750 F.2d at 920; *Patel*, 940 F. Supp. 2d at 546 (Costa, J.); *Holiday Inns*, 493 F. Supp. at 1028. Here, the only testimony the jury had on which to base its royalty award was SPSI's expert's testimony. But the expert did not discuss the portion of SMI's profits that were attributable to its infringing use, let alone suggest that all of SMI's profits were attributable to its infringement. Quite to the contrary, the jury heard through other testimony that much of SMI's business came from customers with whom its principals had preexisting relationships and who were not customers of SPSI. And the jury expressly found that SPSI failed to prove that it was entitled to any profit that SMI had

---

[8] SPSI argues that that this challenge to the royalty-based award is foreclosed by the parties' joint pretrial order. The joint pretrial order instructed that an "agreed proposition of law" was that "[a]ctual damages sustained by [SPSI] . . . can be accounted for by calculating [SPSI's] lost profits resulting from the infringement, or alternatively, as a reasonable royalty for the use of [SPSI's] marks." However, because we base our conclusion on SMI's alternative argument—that the royalty award is not supported by sufficient evidence—we do not address SPSI's foreclosure argument.

earned that was "directly attributable to" SMI's infringing use and further found that the total profit SMI had earned through its infringing use was "zero." These findings are in tension with its royalty award to SPSI, which must be rationally correlated to SMI's infringement. In addition to a lack of evidence on the extent to which SMI benefitted from infringement, the expert also did not discuss the scope of SMI's infringing use relative to the rights it would have received via a license. SMI's infringing use was likely not as extensive as the rights that a license would have bestowed because, unlike in *Boston Professional*, SMI did not use a mark identical to SPSI's. Its name, logo, website, and metal plate affixed to the equipment were all similar but not identical to SPSI's mark. In comparison, as a licensee, SMI could have been granted the right to use a mark identical to SPSI's. Given the limited nature of the expert testimony on royalty damages and the other evidence presented at trial on the nature of SMI's infringement and customers, the royalty award does not bear a rational relationship to SMI's infringing use, and thus we conclude that there is insufficient evidence to support the royalty award.

## B. Unjust Enrichment

The jury also awarded SPSI $230,000 in unjust enrichment after it found that SMI was unjustly enriched by its infringing use. This award was under Texas common law, not the Lanham Act. "An action for unjust enrichment is based upon the equitable principle that a person receiving benefits which were unjust for him to retain ought to make restitution." *Bransom v. Standard Hardware, Inc.*, 874 S.W.2d 919, 927 (Tex. App.—Fort Worth 1994, writ denied). Here, the jury was instructed that, in order to recover for unjust enrichment, SPSI had to prove that SMI "used the goodwill and reputation of [SPSI] to sell its own goods or services." It was further instructed that unjust enrichment "is typically found under circumstances in which one person has

obtained a benefit from another by fraud, duress, or the taking of an undue advantage."

SMI argues that the jury's $230,000 unjust enrichment award is not supported by sufficient evidence. "Unjust enrichment occurs when a person has wrongfully secured a benefit or has passively received one which it would be unconscionable to retain." *Eun Bok Lee v. Ho Chang Lee*, 411 S.W.3d 95, 111 (Tex. App.—Houston [1st Dist.] 2013, no pet.). "A party may recover under the unjust enrichment theory when one person has obtained a benefit from another by fraud, duress, or the taking of an undue advantage." *Heldenfels Bros., Inc. v. City of Corpus Christi*, 832 S.W.2d 39, 41 (Tex. 1992). "Unjust enrichment is not a proper remedy merely because it 'might appear expedient or generally fair that some recompense be afforded for an unfortunate loss' to the claimant, or because the benefits to the person sought to be charged amount to a windfall." *Id.* at 42 (quoting *Austin v. Duval,* 735 S.W.2d 647, 649 (Tex. App.—Austin 1987, writ denied)).

We have few cases analyzing when an unjust enrichment award is appropriate in the trademark infringement context. In one such case, *Texas Pig Stands, Inc. v. Hard Rock Cafe International, Inc.*, we affirmed a district court's rejection of a jury's unjust enrichment award where there was no evidence that the defendant attempted to "palm off" its goods as those of the plaintiff.[9] 951 F.2d 684, 694–95 (5th Cir. 1992). The district court rejected the jury's unjust enrichment award because, while it believed that the defendant knew about the plaintiff's mark, the defendant's use of a similar mark was not "an attempt to profit from the mark but rather in simple disregard of plaintiff's rights." *Id.* at 695. We agreed, noting the plaintiff acknowledged it had not

---

[9] "Palming off" occurs "when a producer misrepresents his own goods or services as someone else's." *Dastar Corp. v. Twentieth Century Fox Film Corp.*, 539 U.S. 23, 27 n.1 (2003).

lost a single sale due to the infringement and that the defendant would have sold just as many of its goods by any other name. *Id.* at 695–96. We concluded that, based on this evidence, there was "simply no indication that [the defendant] attempted to 'palm off' its [goods] as those of [the plaintiff], nor did [the defendant] attempt to associate [its] operation with [that of the plaintiff]." *Id.* at 695. And in another trademark infringement case, *Maltina Corp. v. Cawy Bottling Co.*, we relied on the willfulness of the defendant's infringement (as evidenced by the fact that the defendant's attempt at trademarking the mark was rejected by the PTO due to plaintiff's prior registration of the mark) in finding that an unjust enrichment award (in the form of an accounting of profits) was proper. 613 F.2d 582, 583, 585 (5th Cir. 1980).

In support of the unjust enrichment award, SPSI asserts without elaboration or citation to the record that SMI obtained benefits, such as "low risk accelerated market entry" and referral business, from its infringement and obtained these benefits through "fraud, duress, or . . . undue advantage." This argument is problematic for two reasons. First, these benefits that SMI allegedly received are not the types of benefit for which plaintiffs are typically compensated under a theory of unjust enrichment. In *Texas Pig Stands*, we emphasized the need for evidence that the defendant had attempted to "palm off" its goods for those of the plaintiff, explaining that while such conduct was not a "prerequisite to finding unjust enrichment, it is an important circumstance bearing on the determination." 951 F.2d at 695. Here, SPSI does not allege that SMI attempted to "palm off" its goods as SPSI's. *Texas Pig Stands* also emphasized the need for evidence of diverted sales and lost profits in order to justify an unjust enrichment award. *Id.* But here, the jury found that SMI had earned "zero" profit through its infringing use of SPSI's mark. *Texas Pig Stands* also found significant the fact that the defendant's success seemed independent from its infringing use. *Id.* at 696. Here too, the evidence

showed that SMI was independently successful and the majority of its customers came from its principals' preexisting relationships. SPSI cites no support for the proposition that merely by showing the benefits of eased market entry and referral business, without showing any lost profits, a plaintiff is entitled to an unjust enrichment award.

Second, there was no evidence at trial showing that SMI obtained this benefit through fraud, duress, or undue advantage. Unlike in *Maltina*, where the defendant had full knowledge of the plaintiff's registration of the mark, the evidence showed that, when SMI chose its mark, it had no knowledge of SPSI's existence, nor could it be deemed to have constructive knowledge because the mark was not registered at that time. Where defendants have no knowledge of a mark, it can hardly be said that their infringement was willful. *See Seatrax, Inc.*, 200 F.3d at 372 (relying on lack of jury finding of willfulness to justify denial of unjust enrichment award). SMI did later learn of SPSI's existence, but as discussed in the intent section *supra*, there is no evidence that SMI modified its conduct or its goods after learning of SPSI in an attempt to trade off SPSI's good will or pass off its products as those of SPSI. *Cf. Westchester Media*, 214 F.3d at 666 (concluding that while not initially chosen in bad faith, junior user's subsequent use of its mark "evidenced an intent to trade on [the senior user's] reputation"); *Amstar,* 615 F.2d at 263 (analyzing the junior user's attempt to "pass off" its products as the senior user's). For these reasons we conclude that the unjust enrichment award is not supported by sufficient evidence.[10]

---

[10] Because we vacate the unjust enrichment award based on the insufficiency of the evidence, we do not address SMI's alternative argument that the award represents an impermissible double recovery for the same injury behind the jury's $230,000 royalty award.

## C. Exemplary Damages

As its final damages award, the jury awarded SPSI $230,000 in exemplary damages. Like the unjust enrichment award, the exemplary damages award is governed by Texas law. *See* 15 U.S.C. § 1117(a) (instructing that the damages under the Lanham Act serve as "compensation and not a penalty"). Under Texas law, "exemplary damages may be awarded only if damages other than nominal damages are awarded."[11] Tex. Civ. Prac. & Rem. Code § 41.004(a). Accordingly, because we vacate the royalty and unjust enrichment awards for insufficient evidence, we must also vacate the exemplary damages award.[12]

In sum, we conclude that "injunctive relief satisfies the equities" of this case given the insufficient evidence "of actual damages[]" or of "an intent [by SMI] to confuse or deceive." *Seatrax, Inc.*, 200 F.3d at 372 (quoting *Pebble Beach Co.*, 155 F.3d at 555).

---

[11] Although equitable relief may sometimes support an exemplary damages award under Texas law, *see, e.g.*, *Bear Ranch, LLC v. HeartBrand Beef, Inc.*, No. 6:12-CV-00014, 2015 U.S. Dist. LEXIS 118709, at *22, 39-50 (S.D. Tex. Sept. 4, 2015) (Costa, J.) (exemplary damages available pursuant to "[c]ourt's equitable remedy," which included injunctive relief and a constructive trust), neither party argues, and thus we do not address, whether a stipulated injunction, such as was agreed to here, is the sort of equitable relief that can support an exemplary damages award.

[12] SPSI also argues that SMI's appeal is frivolous "as filed and as argued" and requests sanctions against SMI. Under Federal Rule of Appellate Procedure 38, if we determine that an appeal is frivolous, we "may . . . award just damages and single or double costs to the appellee." We have articulated a high standard for what constitutes a frivolous appeal, holding that an appeal is frivolous only "if the result is obvious or the arguments of error are wholly without merit" and the appeal is taken "in the face of clear, unambiguous, dispositive holdings of this and other appellate courts." *Coghlan v. Starkey*, 852 F.2d 806, 811–12 (5th Cir. 1988) (per curiam) (quoting *Capps v. Eggers*, 782 F.2d 1341, 1343 (5th Cir. 1986)). Here, because we agree with some of SMI's argument on appeal—namely that the jury's damages awards are not supported by sufficient evidence—we reject SPSI's contention that the appeal is frivolous.

## IV. CONCLUSION

We VACATE the royalty, unjust enrichment, and exemplary damages awards. Otherwise, the judgment of the district court is AFFIRMED.