# United States Court of Appeals for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

May 8, 2026

Lyle W. Cayce
Clerk

———————

No. 25-20243

———————

Trojan Battery Company, L.L.C.,

*Plaintiff—Appellee*,

*versus*

Golf Carts of Cypress, L.L.C.; Trojan EV, L.L.C.,

*Defendants—Appellants*.

———————————————————

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:21-CV-3075

———————————————————

Before Jones, Barksdale, and Stewart, *Circuit Judges*.
Carl E. Stewart, *Circuit Judge*:

Trojan Battery Company, L.L.C. ("Trojan Battery") brought this lawsuit against Golf Carts of Cypress, L.L.C. ("GCC") and Trojan EV, L.L.C. ("Trojan EV") (collectively, "Defendants") for trademark infringement and unfair competition under sections 32 and 43(a) of the Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C. §§ 1114, 1125(a), and Texas common law. After a four-day bench trial, the district court found Defendants liable for trademark infringement and unfair competition based on their infringement of Trojan Battery's "TROJAN" marks. The district court awarded Trojan Battery disgorgement of Defendants' profits and

issued a permanent injunction. Thereafter, Defendants appealed. For the following reasons, we AFFIRM the district court's liability judgment and its disgorgement of profits award. However, we VACATE the permanent injunction and REMAND for further proceedings.

## I

*A. Factual Background*

Trojan Battery is a Delaware limited liability company based in California. Since 1925, it has manufactured and sold deep-cycle batteries throughout the world.[1] Today, it manufactures multiple batteries under the TROJAN® brand, including those for golf carts and utility vehicles. It advertises through its website, social media, billboards, trade shows, and print and online publications, including Golf Car Options and Golf Carting Magazine. It sells TROJAN® batteries to original equipment manufacturers ("OEMs") who install batteries into their products and to master distributors who sell to retail stores in the "aftermarket." Overall, TROJAN® batteries constitute 80% of the OEM market and 50% of the aftermarket for golf-cart batteries. Because of the goodwill in the TROJAN® brand, TROJAN® batteries sell at a premium price, and Trojan Battery sells hundreds of millions of dollars in TROJAN® batteries for golf carts each year. Trojan Battery owns the following three trademark registrations (collectively, "TROJAN® Marks"):

> (1) Registration No. 1,813,578 for the mark "TROJAN," which it uses for electric storage batteries;
>
> (2) Registration No. 5,182,780 for the mark "TROJAN BATTERY SALES," which it uses in connection with

---

[1] "Deep-cycle" batteries are "used until they have discharged most of their capacity before being recharged."

"[r]etail and wholesale store services and wholesale distributorships featuring Deep Cycle Batteries, AGM Batteries and Deep Cycle Batteries, Auto and Commercial Starting Batteries, Marine Batteries, Lawn and Garden Starting Batteries, Motorcycle Batteries, Acid Pack Batteries, SLA Batteries, Battery Chargers, Watering Kits for batteries, Seat Kits for batteries, Cables, and Battery Testers"; and

(3) Registration No. 5,951,233 for the mark below, which it uses for electric storage batteries, deep-cycle electric storage batteries, and lithium-ion batteries:



Defendants GCC and Trojan EV were owned by Federico Nell.[2] Nell first entered the golf-cart business in February 2019, and in August 2019, founded GCC in Cypress, Texas. GCC originally sold used Club Car, EZ-GO, and Yamaha golf carts. In October 2020, Nell established Trojan EV in Houston, Texas to sell new golf carts under the brand "Trojan-EV." Trojan EV marketed its golf carts to potential authorized dealers through its website, which contained a "Become a Dealer" link that visitors could use to express interest in becoming an authorized dealer of Trojan-EV golf carts. GCC was an authorized dealer of Trojan-EV golf carts as well as golf carts sold under Nell's other two brands: "EV Titan" and "Spartan-EV." GCC sold golf carts on its website, advertised a service department that was equipped to assist with "replacement batteries," and sold golf carts that contained TROJAN® batteries. In January 2021, Defendants began selling

---

[2] Defendants voluntarily filed for Chapter 11 bankruptcy in April 2024.

Trojan-EV golf carts in the United States with the following mark ("TROJAN-EV Mark"):



.

In July 2021, Bill Malloy, a golf-cart dealer and the owner of Nashville Powersports, clicked the "Become a Dealer" link on Trojan EV's website. After providing his contact information, he received and completed a "New Authorized Dealer Interest Form" and "Confidentiality Agreement" to receive pricing information. When Malloy first visited the Trojan EV website, he "thought they were part of Trojan Battery" and "didn't think [the golf carts] were that attractive." After searching Trojan EV's website, Malloy "realized that they weren't the same company, [that] the contact information was different, [and that they were] very different companies." On July 29, 2021, after receiving a solicitation email from Trojan EV inviting him to become a dealer for Trojan EV, Malloy forwarded the email to Rick Sanders, a national account manager for Trojan Battery. Malloy wrote that he "though[t] this might be you guys for a minute . . . . Thankfully it's not, ugly carts . . . . [Tell] them the Trojan name is taken!" That same day, Sanders forwarded the email to Bob Pigott, Trojan Battery's Vice President of Sales for North America, and Pigott forwarded the email to Trojan Battery's in-house counsel.

On July 30, 2021, Trojan Battery's outside counsel sent Defendants a cease-and-desist letter, asserting that Defendants' unauthorized use of the TROJAN® Marks was causing consumer confusion and constituted trademark infringement and unfair competition under federal and state law. Trojan EV's counsel responded, denying that the TROJAN-EV Mark was

confusingly similar to the TROJAN® Marks. Defendants ultimately declined to cease their use of the TROJAN-EV Mark.

### B. Procedural History

On September 21, 2021, Trojan Battery filed suit against Defendants in the Southern District of Texas for trademark infringement and unfair competition under the Lanham Act and Texas common law.[3] The district court held a bench trial from June 8, 2023 to June 13, 2023. It issued detailed Findings of Fact and Conclusions of Law on March 28, 2024, concluding that Defendants were liable for trademark infringement and unfair competition based on their infringement of the TROJAN® Marks. It awarded disgorgement of Defendants' profits, explaining that it was "necessary and appropriate to make Defendants' infringement unprofitable, avoid unjust enrichment, and deter future willful infringement."[4] It also stated that Defendants would be permanently enjoined from further infringement in a separately filed order.

On April 26, 2024, Defendants filed a suggestion of bankruptcy, informing the court that they had voluntarily filed for Chapter 11 bankruptcy. The district court then stayed the case pending the Defendants' bankruptcy proceedings. After the bankruptcy stay was lifted, Trojan Battery filed a motion for entry of a permanent injunction. Defendants then filed an amended Rule 52(b) motion, urging the district court to amend its findings of

---

[3] "The label 'unfair competition' is an 'umbrella' comprising distinct causes of action under Texas law," including trademark infringement. *Motion Med. Techs., L.L.C. v. Thermotek, Inc.*, 875 F.3d 765, 770 n.2 (5th Cir. 2017) (citation omitted); *see also* 1 *McCarthy on Trademarks and Unfair Competition* § 1:8 (5th ed. 2026) (citations omitted).

[4] The district court initially awarded Trojan Battery $1,187,699 from Trojan EV and $1,422,727 from GCC. The parties later jointly identified additional profits subject to disgorgement and calculated the total disgorgement award as $1,301,507 from Trojan EV and $3,400,215 from GCC.

fact and conclusions of law and to make additional findings, which Trojan Battery opposed. The district court ultimately granted Trojan's Battery motion for entry of a permanent injunction and denied Defendants' motion for amended findings of fact and conclusions of law.[5] It entered a permanent injunction the same day. Defendants timely appealed.

## II

Because this is an appeal from a final judgment under the Lanham Act, this court has jurisdiction under 28 U.S.C. § 1291 and 15 U.S.C. § 1121(a). This court has supplemental jurisdiction over Trojan Battery's state-law claims under 28 U.S.C. § 1367(a).

On appeal, Defendants raise three main arguments. First, they argue that the district court clearly erred in finding a likelihood of confusion between the parties' marks, and, in turn, that they are liable for trademark infringement and unfair competition. Second, they assert that the district court abused its discretion by awarding Trojan Battery disgorgement of their profits. [6] And third, they contend that even if they are liable for trademark infringement and unfair competition, the district court abused its discretion by issuing an overbroad permanent injunction. We address each of these arguments in turn.

_____

[5] The district court also denied Trojan Battery's request to join Nell as a party for the purpose of seeking attorney's fees from him.

[6] Defendants note that they raised the issue of disgorgement of profits in their amended Rule 52(b) motion, and that they also challenge the denial of this motion "[t]o the extent . . . necessary to prevail." However, they do not present independent arguments as to why the district court abused its discretion in denying their amended Rule 52(b) motion in their appellate briefs. Therefore, this argument is forfeited. *See Rollins v. Home Depot USA*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by failing . . . to adequately brief the argument on appeal.").

*A. Trademark Infringement*

Under the Lanham Act, a trademark is "any word, name, symbol, or device, or any combination thereof [used] to identify and distinguish . . . goods, including a unique product, from those manufactured or sold by others and to indicate the source of the goods, even if that source is unknown." 15 U.S.C. § 1127. "To recover on a claim of trademark infringement, a plaintiff must first show that the mark is legally protectable and must then establish infringement by showing a likelihood of confusion." *Am. Rice, Inc. v. Producers Rice Mill, Inc.*, 518 F.3d 321, 329 (5th Cir. 2008) (citations omitted). "The elements of common law trademark infringement under Texas law are the same as those under the Lanham Act." *Streamline Prod. Sys., Inc. v. Streamline Mfg., Inc.*, 851 F.3d 440, 450 (5th Cir. 2017) (citation omitted). Only the second element of trademark infringement is at issue in this appeal.

Once a plaintiff proves that its mark is legally protectable, it must then establish that the defendant's use of its mark "creates a likelihood of confusion in the minds of potential consumers as to the 'source, affiliation, or sponsorship'" of the product at issue. *See Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 663 (5th Cir. 2000) (citations omitted). "Likelihood of confusion is synonymous with a probability of confusion, which is more than a mere possibility of confusion." *Id.* at 663–64 (citing *Elvis Presley Enters., Inc. v. Capece*, 141 F.3d 188, 193 (5th Cir. 1998)). To determine whether a likelihood of confusion exists, this court considers the following nonexhaustive list of eight factors or "digits of confusion":

(1) the type of mark allegedly infringed,[7] (2) the similarity between the two marks, (3) the similarity of the products or services, (4) the identity of the retail outlets and purchasers, (5) the identity of the advertising media used, (6) the defendant's intent, (7) any evidence of actual confusion, and (8) the degree of care exercised by potential purchasers.

*Streamline Prod. Sys.*, 851 F.3d at 453 (cleaned up); *see also Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll. v. Smack Apparel Co.*, 550 F.3d 465, 478 (5th Cir. 2008) (citing *Westchester Media*, 214 F.3d at 664; *Am. Rice*, 518 F.3d at 329). "No single factor is dispositive, and a finding of a likelihood of confusion need not be supported by a majority of the factors." *Smack Apparel Co.*, 550 F.3d at 478 (citing *Am. Rice*, 518 F.3d at 329). Courts may weigh the digits "differently from case to case, depending on the particular facts and circumstances involved." *Streamline Prod. Sys.*, 851 F.3d at 453 (citation modified).

We review a district court's finding of a likelihood of confusion for clear error. *Elvis Presley Enters.*, 141 F.3d at 196 (citations omitted). A district court's finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. City of Bessemer*, 470 U.S. 564, 573 (1985) (internal quotation marks and citation omitted). "This standard plainly does not entitle this court to reverse the findings of the trial judge simply because we are convinced that we would or could decide the case differently." *Guzman v. Hacienda Recs. & Recording Studio, Inc.*, 808 F.3d 1031, 1036 (5th Cir. 2015) (citing *In re Luhr Bros., Inc.*, 157 F.3d 333, 337 (5th Cir. 1998)). Moreover, "the clearly erroneous standard

---

[7] This digit of confusion is also known as the "strength of the mark." *See Streamline Prod. Sys.*, 851 F.3d at 453–54 (citation omitted).

of review following a bench trial requires even 'greater deference to the trial court's findings when they are based upon determinations of credibility.'" *Id.* (citing *In re Luhr Bros.*, 157 F.3d at 338; Fed. R. Civ. P. 52(a)(6)).

As an initial matter, Defendants argue that the district court's factual findings and conclusions of law are copied almost verbatim from Trojan Battery's proposed factual findings and conclusions of law. Therefore, they assert that "this [c]ourt 'can take into account the [d]istrict [c]ourt's lack of personal attention to factual findings in applying the clearly erroneous rule.'" *See Amstar Corp. v. Domino's Pizza, Inc.*, 615 F.2d 252, 258 (5th Cir. 1980). However, we have recognized that

> [t]his court . . . is not free lightly to embrace the conclusion that a judgment is wrong. The district court's findings of fact cannot be overturned unless they are clearly erroneous. This rule applies whether the trial judge prepared his own findings of fact or whether they were developed by one of the parties and adopted verbatim by the judge.

*Falcon Const. Co. v. Econ. Forms Corp.*, 805 F.2d 1229, 1232 (5th Cir. 1986) (citing Fed. R. Civ. P. 52(a); *Anderson*, 470 U.S. at 572).

Even though the district court adopted almost all of Trojan Battery's proposed findings, the district court did not clearly err in finding that there is a likelihood of confusion between the parties' marks, and, in turn, that Defendants are liable for trademark infringement and unfair competition. We analyze each digit of confusion in turn.

### 1. Strength of the Mark

The district court found that the TROJAN® Marks are "very strong marks in connection with golf-cart batteries and are entitled to a wide scope of protection in the golf cart market." "Generally, the stronger the mark, the greater the likelihood that consumers will be confused by competing uses of

the mark." *Smack Apparel Co.*, 550 F.3d at 479 (citing *Elvis Presley Enters.*, 141 F.3d at 201). To determine the strength of a mark, this court considers where the mark falls on the spectrum of distinctiveness; and the mark's standing in the marketplace. *See Am. Rice*, 518 F.3d at 330 (citation modified). The spectrum "divides the distinctiveness of marks into five categories: (1) generic, (2) descriptive, (3) suggestive, (4) arbitrary, and (5) fanciful." *Streamline Prod. Sys.*, 851 F.3d at 451 (citation modified). "[W]ithin this spectrum[,] the strength of a mark, and of its protection, increases as one moves away from generic and descriptive marks toward arbitrary marks." *Am. Rice*, 518 F.3d at 330 (internal quotation marks and citations omitted). "Generic terms can never be trademarks, descriptive terms are not inherently distinctive and suggestive, arbitrary[,] and fanciful terms are regarded as being inherently distinctive." 1 *McCarthy on Trademarks and Unfair Competition* § 11:2 (5th ed. 2026) (citing *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763 (1992)).

While Defendants argue that the TROJAN® Marks are suggestive, the district court concluded that they are arbitrary. "Suggestive marks 'require[] the consumer to ***exercise the imagination*** in order to draw a conclusion as to the nature of the goods.'" *Future Proof Brands, L.L.C. v. Molson Coors Beverage Co.*, 982 F.3d 280, 291 (5th Cir. 2020) (quoting *Amazing Spaces, Inc. v. Metro Mini Storage*, 608 F.3d 225, 241 (5th Cir. 2010)). "Arbitrary marks '***bear no relationship*** to the products or services to which they are applied.'" *Id.* (quoting *Amazing Spaces*, 608 F.3d at 241). Although it may be difficult to distinguish "arbitrary" marks from "suggestive" marks, "for legal purposes, there is little, if any, reason to make the distinction, and the cases hardly ever bother to do so." 1 *McCarthy*, *supra*, § 11:12. This is because "arbitrary" marks and "suggestive" marks "fall within the same legal pigeon hole of

classification in that neither category requires proof of secondary meaning for legal protection and registration."[8] *Id.* (citing *Two Pesos*, 505 U.S. at 763).

Whether the TROJAN® Marks are arbitrary or suggestive, the district court correctly determined that they are strong marks due to their commercial strength in the golf industry. It explained:

> The evidence demonstrates that the TROJAN® brand has become very strong in the golf industry through decades of use, marketing to a broad range of golf industry consumers, hundreds of millions in sales, a large market share, and the well-known reputation of the TROJAN® brand in the golf cart market.

Based on the commercial strength and popularity of the TROJAN® Marks in the golf industry, the district court did not clearly err in finding them to be strong. *See* 1 *McCarthy*, *supra*, § 11:12 (noting that a mark's classification as "arbitrary" or "suggestive" does not have a meaningful impact on the mark's strength).

Defendants further contend that the district court erred by discounting the impact of third-party usage and trademark registrations while analyzing the strength of the TROJAN® Marks. This court has held that "'extensive' third-party use can weaken a mark and negate a likelihood of confusion." *Smack Apparel Co.*, 550 F.3d at 479 (quoting *Sun Banks of Fla., Inc. v. Sun Fed. Sav. & Loan Ass'n*, 651 F.2d 311, 316 (5th Cir. 1981)). "All third-party use of a mark, not just use in the same industry as a plaintiff, may be relevant to whether a plaintiff's mark is strong or weak." *Id.* (footnote omitted); *see also Amstar Corp.*, 615 F.2d at 259 (considering evidence of

---

[8] "A mark has acquired secondary meaning when it 'has come through use to be uniquely associated with a specific source.'" *Smack Apparel Co.*, 550 F.3d at 476 (quoting *Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 535 (5th Cir. 1998)).

third-party uses and registrations on unrelated products). "But the key is whether the third-party use diminishes in the public's mind the association of the mark with the plaintiff." *Smack Apparel Co.*, 550 F.3d at 479 (citation omitted).

The district court did not clearly err in concluding that the evidence of third-party uses and registrations did not weaken the TROJAN® Marks in the market for golf carts. Defendants presented two well-known uses of "Trojan," including Trojan condoms and the University of Southern California Trojan mascot. They also submitted a declaration with twenty-nine trademark registrations from the United States Patent and Trademark Office website attached. Of the twenty-nine registrations, four marks belong to Trojan Battery, nineteen marks were listed as "DEAD," and six marks were listed as "LIVE." The "LIVE" registrations involve printing machines, tires, and key rings of non-precious metals.

While third-party uses and trademark registrations on unrelated products can weaken a mark, *Amstar Corp.*, 615 F.2d at 259, the district court properly analyzed "whether the third-party use diminishes in the public's mind the association of the mark with the plaintiff." *Smack Apparel Co.*, 550 F.3d at 479 (citation omitted). Further, "[w]e will not assume any knowledge on the part of the purchasing public by mere registrations in the Patent Office, nor will we assume that the marks are in continuing use, so as to have any effect on the mind of the purchasing public merely because they had been so registered." *Turner v. HMH Publ'g Co.*, 380 F.2d 224, 228 n.2 (5th Cir. 1967). Whereas the defendants in *Amstar* presented evidence of fifteen third-party uses of the "Domino" mark, Defendants only presented two uses of "Trojan." *See* 615 F.2d at 259. And while the defendants in *Amstar* also introduced seventy-two third-party registrations, the Defendants in this case presented only twenty-five. *See id.* Defendants provided no evidence that the third-party uses and registrations of "Trojan" weaken consumers'

association of the TROJAN® Marks with Trojan Battery within the market for golf products. As such, the district court did not clearly err in holding that Defendants' evidence "falls far below that of extensive use" required to weaken the TROJAN® Marks within the golf industry. *See Smack Apparel Co.*, 550 F.3d at 479. Therefore, the district court did not clearly err in finding the TROJAN® Marks to be strong.

### *2. Similarity of the Marks*

The district court found that "the parties' respective marks are highly similar and that this factor weighs in favor of a likelihood of confusion." The TROJAN® Marks consist of a solid winged horse and the words "Trojan Battery Company," and the TROJAN-EV Mark contains the side view of a warrior Spartan helmet and the words "TROJAN-EV" underlined with a spear:



This court has observed that "[t]he more similar the marks, the greater the likelihood of confusion." *Streamline Prod. Sys.*, 851 F.3d at 454 (citation omitted). To assess the similarity of marks, courts are required to consider the marks' "appearance, sound, and meaning." *See id.* (quoting *Smack Apparel Co.*, 550 F.3d at 479). "Similarity of appearance is determined on the basis of the total effect of the designation, rather than on a comparison of individual features," but "courts should give more attention to the dominant features of a mark." *Xtreme Lashes, LLC v. Xtended Beauty, Inc.*,

576 F.3d 221, 228 (5th Cir. 2009) (internal quotation marks and citations omitted). Moreover, "[e]ven if two marks are distinguishable, we ask whether, under the circumstances of use, the marks are similar enough that a reasonable person could believe the two products have a common origin or association." *Id.* (citing *Elvis Presley Enters.*, 141 F.3d at 201). "To determine the 'meaning and connotation' of the marks, we consider the context of use, such as labels, packaging, and advertising." *Id.*

The district court did not clearly err in finding that the TROJAN® Marks are highly similar, and that this digit weighs in favor of a likelihood of confusion. As to similarity of appearance, the district court properly focused on the dominant element of the parties' marks, the word "TROJAN," which is consistent with this court's analysis in *Streamline*. *See* 851 F.3d at 454. Additionally, it considered evidence that consumers often refer to Trojan Battery's products as "TROJAN," which also demonstrates that the parties' marks sound similar. And while the logos in the parties' marks are different, the parties' marks are used in manner in which "a reasonable person could believe the two products have a common origin or association." *Xtreme Lashes*, 576 F.3d at 228 (citing *Elvis Presley Enters.*, 141 F.3d at 201). As discussed *supra*, the record shows that Trojan Battery and Trojan EV operate in the golf industry, employ the same advertising channels, and market to the same customers. Therefore, "there is no question that the overall similarity of the marks, in the context of their use, creates a likelihood in the minds of [consumers]" that Trojan Battery and Trojan EV are "somehow associated." *See All. for Good Gov't v. Coal. for Better Gov't*, 901 F.3d 498, 511 (5th Cir. 2018) (quoting *Elvis Presley Enters.*, 141 F.3d at 201). As such, the district court did not clearly err in finding the parties' marks to be similar.

No. 25-20243

### 3. Similarity of the Products or Services

The district court found that "golf cart batteries and golf carts are highly related products, and that this factor weighs heavily in favor of a likelihood of confusion." "The greater the similarity between the products and services, the greater the likelihood of confusion." *Exxon Corp. v. Tex. Motor Exch. of Hous., Inc.*, 628 F.2d 500, 505 (5th Cir. 1980). "Complementary products have been held particularly susceptible to confusion." *See Fuji Photo Film Co. v. Shinohara Shoji Kabushiki Kaisha*, 754 F.2d 591, 598 (5th Cir. 1985) (citations omitted). This court has also explained:

> When products or services are noncompeting, the confusion at issue is one of sponsorship, affiliation, or connection. . . . The danger of affiliation or sponsorship confusion increases when the junior user's services are in a market that is one into which the senior user would naturally expand. . . . The actual intent of the senior user to expand is not particularly probative of whether the junior user's market is one into which the senior user would naturally expand. . . . Consumer perception is the controlling factor.

*Elvis Presley Enters.*, 141 F.3d at 202 (citations omitted).

The district court did not clearly err in concluding that golf-cart batteries and golf carts are highly related, and that this digit weighs in favor of a likelihood of confusion. It reasonably determined that the products are complementary because they are often used and sold together. *See Fuji Photo Film Co.*, 754 F.2d at 598. It also explained that the evidence shows that at least one other company, Star EV, uses the same brand to sell golf carts and golf-cart batteries. As such, consumers might believe that there is a connection between Trojan EV and Trojan Battery. Contrary to Defendants' argument, this evidence also suggests that consumers could believe that

15

Trojan Battery would naturally expand into the golf-cart market regardless of whether it desires to do so. *See Elvis Presley Enters.*, 141 F.3d at 202 (citations omitted). Therefore, the district court did not clearly err in finding that the parties' products are highly related.

#### 4. Identity of the Retail Outlets and Purchasers

Defendants concede the district court's finding that the identity of the parties' retail outlets and purchasers "weighs in favor of a likelihood of confusion because both parties sell their products primarily in golf cart retail stores to similar purchasers: people who own or use golf carts." The district court explained that "at least five dealers already sell both TROJAN® batteries and Trojan-EV golf carts," and that "the largest customers for Trojan EV other than [GCC] are all TROJAN® battery dealers." Therefore, the district court's finding that this digit supports a likelihood of confusion is not clearly erroneous.

#### 5. Identity of the Advertising Media Used

Defendants also concede the district court's finding that "[i]n light of the overlap in advertising media and the types of advertising campaigns . . . this digit weighs heavily in favor of a likelihood of confusion." Given the undisputed evidence that Trojan Battery and Trojan EV use the same advertising channels, the district court's finding is not clearly erroneous.

#### 6. Defendants' Intent

The district court found that Defendants "intended to trade on the goodwill buil[t] up in [Trojan Battery's] TROJAN® brand, and that this factor weighs in favor of a finding of likelihood of confusion." "Although not necessary to a finding of likelihood of confusion, a defendant's intent to confuse may alone be sufficient to justify an inference that there is a

likelihood of confusion." *Smack Apparel Co.*, 550 F.3d at 481 (citing *Elvis Presley Enters.*, 141 F.3d at 203). This court has found an intent to confuse "when the evidence indicates that the defendant, in choosing its mark, knew about the plaintiff's mark and intended to capitalize on the plaintiff's popularity." *Streamline Prod. Sys.*, 851 F.3d at 456 (citing *Smack Apparel Co.*, 550 F.3d at 481–83; *Am. Rice*, 518 F.3d at 332–33). Moreover, a defendant's "mere awareness" of a plaintiff's mark is not sufficient for establishing an intent to confuse. *See id.* (quoting *Conan Props., Inc. v. Conans Pizza, Inc.*, 752 F.2d 145, 150 (5th Cir. 1985)).

While whether Defendants intended to confuse is a close question, we cannot say that the district court clearly erred in finding that Defendants intended to trade on the goodwill of the TROJAN® brand, and that their infringement was willful. Nell testified that he did not learn about TROJAN® batteries until November 2020. The district court did not believe his testimony for several reasons. First, it observed that Nell began selling golf carts in February 2019 and organized GCC in August 2019 to sell used Club Car, Yamaha, and EZ-GO golf carts, which exclusively use TROJAN® batteries. Second, it cited evidence that GCC's website touted having "certified technicians" who could perform services such as "replac[ing] batteries" as well as the dominant market share of TROJAN® batteries. Nell also acknowledged that there was a picture of TROJAN® batteries on GCC's website in 2019.

Third, the district court concluded that Nell was aware of TROJAN® batteries before November 2020 based on an email exchange between Jose Fuentes, Nell's account manager at GCC, and a Continental Batteries sales representative. Nell testified that he first learned of TROJAN® batteries when Fuentes showed him an email in which the sales representative offered to sell Fuentes and GCC three types of batteries: (1) Trojan T975 at $95; (2) Continental 2GC-8V at $80; and (3) US 8volt at $87. Approximately

twenty-four hours later, Fuentes responded: "Can you do 90 for the Trojans and 25 on the cores?" The district court determined that this response "strongly suggests that [Nell] and [Fuentes] were familiar enough with TROJAN® batteries to want to purchase them at a higher price than any of the other batteries offered, not that they were only just hearing about them for the first time." The district court ultimately determined that the totality of these facts "support[s] the strong inference that [Nell] was not being truthful in testifying that he did not know of TROJAN® batteries at the time he organized Trojan EV on October 21, 2020," and that "this lack of truthfulness [is] strong evidence of intent to deceive and intent to trade on the TROJAN® name."

The district court did not clearly err in these findings. The evidence supports a finding that Defendants, in choosing the TROJAN-EV Mark, "knew about [Trojan Battery's] mark and intended to capitalize on [its] popularity." *Streamline Prod. Sys.*, 851 F.3d at 456 (citing *Smack Apparel Co.*, 550 F.3d at 481–83; *Am. Rice*, 518 F.3d at 332–33). The district court did not rely on "mere awareness;" rather, it found Nell's testimony unbelievable that he did not know about the TROJAN® Marks when he organized Trojan EV, which supports an inference that Defendants intended to confuse.[9] *See id.* (quoting *Conan Props.*, 752 F.2d at 150). While it is possible that there are other explanations for Defendants' decision to adopt the TROJAN-EV

_____

[9] At oral argument, counsel for Defendants argued for the first time that it was improper for the district court to infer bad faith based on circumstantial evidence, citing *Viacom International v. IJR Capital Investments, L.L.C.*, 891 F.3d 178, 196 (5th Cir. 2018). Because Defendants did not raise this argument in their briefs, it is forfeited. *See United States v. Robinson*, 67 F.4th 742, 752 n.3 (5th Cir. 2023) (citation omitted). Additionally, counsel mentioned *In re Luhr Brothers*, 157 F.3d at 339–43, at oral argument, and Defendants cited it in their opening brief as an example of this court disturbing a district court's adverse credibility finding. However, as discussed *supra*, the totality of the evidence supports the district court's credibility determination.

Mark, there is no compelling reason to prefer these alternative explanations over the district court's interpretation of the evidence, especially in light of its finding that Nell was not being truthful while testifying. *See Guzman*, 808 F.3d at 1036 (citing *In re Luhr Bros.*, 157 F.3d at 338) ("[T]he clearly erroneous standard of review following a bench trial requires even 'greater deference to the trial court's findings when they are based upon determinations of credibility.'"); *see also Lee v. Miller Cnty.*, 800 F.2d 1372, 1376 (5th Cir. 1986) ("We are not free to substitute our own judgment for that of the district court. Rather[,] we must accord the district court's decision a high presumption of correctness and only overturn that decision if it is based upon clearly erroneous facts or an erroneous conclusion of law."). Therefore, the district court did not clearly err in concluding that Defendants intended to trade on the goodwill of the TROJAN® brand, and that this digit weighs in favor of a likelihood of confusion.

### 7. Actual Confusion

The district court found that "Trojan Battery has demonstrated evidence of actual confusion and that this factor therefore weighs heavily in favor of a finding of likelihood of confusion." "Evidence that consumers have been actually confused in identifying the defendant's use of a mark as that of the plaintiff may be the best evidence of a likelihood of confusion." *Smack Apparel Co.*, 550 F.3d at 483 (citing *Elvis Presley Enters.*, 141 F.3d at 203). This court has recognized that "[a] plaintiff may show actual confusion using anecdotal instances of consumer confusion, systematic consumer surveys, or both." *Streamline Prod. Sys.*, 851 F.3d at 457 (citing *Scott Fetzer Co. v. House of Vacuums Inc.*, 381 F.3d 477, 486 (5th Cir. 2004)). However, proof of actual confusion on the part of end consumers is not required. *See Fuji Photo Film Co.*, 754 F.2d at 597 ("In no case have we sanctioned total disregard of evidence of actual confusion; there is simply no precedent for such a view, regardless of the identity of the person confused."). Evidence of

actual confusion "must show 'more than a fleeting mix-up of names.'" *Streamline Prod. Sys.*, 851 F.3d at 457 (quoting *Xtreme Lashes*, 576 F.3d at 230). While "very little proof is required when customer purchases were actually swayed . . . more is required when the confusion did not or cannot sway purchases." *Rex Real Est. I, L.P. v. Rex Real Est. Exch., Inc.*, 80 F.4th 607, 625 (5th Cir. 2023).

In *Amstar*, the plaintiff's evidence of actual confusion included "two verbal inquiries as to whether 'Domino's Pizza' was related to 'Domino' sugar, and one misaddressed letter." 615 F.2d at 263. This court held that "[i]n view of the fact that both plaintiff's and defendants' sales currently run into the millions of dollars each year, these isolated instances of actual confusion are insufficient to sustain a finding of likelihood of confusion." *Id.* (citing *Armstrong Cork Co. v. World Carpets, Inc.*, 597 F.2d 496, 506 (5th Cir. 1979); *Scott Paper Co. v. Scott's Liquid Gold, Inc.*, 589 F.2d 1225, 1231 (3rd Cir. 1978)). This court further noted that "only three instances of actual confusion" during "nearly 15 years of extensive concurrent sales under the parties' respective marks raises a presumption against likelihood of confusion in the future." *Id.* (citation omitted).

As evidence of actual confusion, Trojan Battery presented golf-cart dealer Bill Malloy's testimony and four emails, which amounts to just five instances of confusion over roughly two and a half years of concurrent sales. This evidence is ultimately insufficient to sustain a finding of a likelihood of confusion given the fact that the parties' sales ran into the millions of dollars each year. *See Amstar*, 615 F.2d at 263. Although the district court determined that the context of the messages in the record demonstrates that the confusion was "caused by the trademarks employed" and "swayed consumer purchases," there is no evidence that the TROJAN® Marks brought consumers to the Trojan EV website in the first place. *Contra Elvis Presley Enters.*, 141 F.3d at 204 (finding that "initial-interest confusion is

beneficial to the [d]efendants because it brings patrons in the door"). In other words, no evidence was presented that Trojan Battery's trademark brought consumers to Trojan EV's door. Therefore, we hold that the district court clearly erred in finding that "[t]he evidence of actual confusion is compelling in this case," and that it weighs in favor of a likelihood of confusion.

### 8. Degree of Care Exercised by Potential Purchasers

The district court found that retail dealers and end-users of golf carts are not "particularly sophisticated in any way that would assist them in distinguishing between such closely related trademarks in such closely related fields," and that this digit weighs in favor of a likelihood of confusion. "Where items are relatively inexpensive, a buyer may take less care in selecting the item, thereby increasing the risk of confusion." *Smack Apparel Co.*, 550 F.3d at 483 (citing *Sun-Fun-Prods., Inc. v. Suntan Rsch. & Dev. Inc.*, 656 F.2d 186, 191 (5th Cir. 1981)). "However, a high price tag alone does not negate other indicia of likelihood of confusion, especially if the goods or marks are similar." *Xtreme Lashes*, 576 F.3d at 231 (citing *Fuji Photo Film Co.*, 754 F.2d at 595–96).

The district court did not clearly err in finding that the degree of care exercised by consumers weighs in favor of a likelihood of confusion. The record evidence for actual confusion supports the district court's finding as to this digit as well. Although Defendants primarily argue that purchasers exercise substantial care because golf-cart batteries and golf carts are expensive, even golf-cart dealer Malloy initially believed that Trojan EV and Trojan Battery were related when visiting Trojan EV's website. Additionally, as discussed *supra*, other consumers and golf-cart dealers were likely confused based on the messages they sent to Trojan EV through its "Become a Dealer" link on its website. While Defendants cite Nell's testimony for the proposition that "prospective purchasers bought golf carts from GCC after

learning of the different drive qualities, safety features, and comfort features, including by test driving multiple carts," Defendants do not provide evidence that end-users exercise enough care to avoid confusing different brands of golf carts. Therefore, the district court did not clearly err in finding that this digit weighs in favor of a likelihood of confusion.

### 9. *Weighing the Digits of Confusion*

Although the district court clearly erred in concluding that actual confusion weighs in favor of a likelihood of confusion, it did not clearly err in its ultimate conclusion that the remaining digits of confusion weigh in favor of a likelihood of confusion. Defendants concede that the identity of the retail outlets and purchasers weighs in favor of a likelihood of confusion and the identity of the advertising media used weighs heavily in favor of a likelihood of confusion. And five out of the remaining six digits weigh in favor of a likelihood of confusion. Therefore, the district court did not clearly err in its ultimate conclusion. *See Smack Apparel Co.*, 550 F.3d at 483 (footnote omitted) ("It is well established . . . that evidence of actual confusion is not necessary for a finding of a likelihood of confusion."). Therefore, the district court did not clearly err in finding that Defendants are liable for trademark infringement and unfair competition.

### B. *Disgorgement of Defendants' Profits*

After finding a defendant liable for trademark infringement under the Lanham Act, a district court has the discretion to award a plaintiff the defendant's profits "subject to the principles of equity." 15 U.S.C. § 1117(a). To determine whether disgorgement is equitable, courts consider factors including, but not limited to:

> (1) whether the defendant had the intent to confuse or deceive,
> (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in

asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

*Pebble Beach Co. v. Tour 18 I Ltd.*, 155 F.3d 526, 554 (5th Cir. 1998) (citations omitted), *abrogated on other grounds by Ill. Tool Works, Inc. v. Rust Oleum Corp.*, 955 F.3d 512 (5th Cir. 2020). Moreover, "[t]his [c]ourt has held it appropriate to award profits of an infringer pursuant to [section] 1117(a) for various purposes: to compensate for diverted sales, to remedy unjust enrichment of the infringer, or to deter future infringement." *Am. Rice*, 518 F.3d at 340 (citing *Maltina Corp. v. Cawy Bottling Co., Inc.*, 613 F.2d 582, 585 (5th Cir. 1980)).

"Once an award is found to be appropriate, a markholder is only entitled to those profits attributable to the unlawful use of its mark." *Pebble Beach Co.*, 155 F.3d at 554 (citations omitted). In assessing a defendant's profits, "the plaintiff shall be required to prove defendant's sales only; [the] defendant must prove all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). In interpreting the profits language in the Trademark Act of 1905, which is "substantially identical" to that in the Lanham Act, the Supreme Court endorsed this burden-shifting framework:

> Although the award of profits is designed to make the plaintiff whole for losses which the infringer has caused by taking what did not belong to him, Congress did not put upon the despoiled the burden—as often as not impossible to sustain—of showing that but for the defendant's unlawful use of the mark, particular customers would have purchased the plaintiff's goods.
>
> If it can be shown that the infringement had no relation to profits made by the defendant, that some purchasers bought goods bearing the infringing mark because of the defendant's recommendation or his reputation or for any reason other than

a response to the diffused appeal of the plaintiff's symbol, the burden of showing this is upon the poacher. The plaintiff of course is not entitled to profits demonstrably not attributable to the unlawful use of his mark. . . . The burden is the infringer's to prove that his infringement had no cash value in sales made by him. If he does not do so, the profits made on sales of goods bearing the infringing mark properly belong to the owner of the mark.

*Mishawaka Rubber & Woolen Mfg. Co. v. S.S. Kresge Co.*, 316 U.S. 203, 206–07 (1942) (citations omitted); 4 *McCarthy*, *supra* § 30:65 ("[T]he U.S. Supreme Court recognized that the plaintiff is not entitled to profits demonstrably not attributable to infringing use. However, the burden is upon the infringer to so prove."). In sum, the plaintiff has the burden of proving a defendant's sales or profits, and the defendant has the burden of proving the profits that are not attributable to its infringement.

We review a district court's award of disgorgement of profits under the Lanham Act for abuse of discretion. *See Am. Rice*, 518 F.3d at 336 (citations omitted). A district court abuses its discretion "if [it] 'misapplies the law or bases its decision upon erroneous findings of fact.'" *Bear Ranch, L.L.C. v. Heartbrand Beef, Inc.*, 885 F.3d 794, 805 (5th Cir. 2018) (citation omitted). "The district court otherwise has great latitude to determine the nature of the infringing conduct and its adverse effects, if any, on the plaintiff, and to fashion relief accordingly." *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 919 F.3d 869, 874–75 (5th Cir. 2019) (citation modified).

### 1. Entitlement to Disgorgement

The district court did not abuse its discretion in awarding Trojan Battery disgorgement of Defendants' profits. A district court has the discretion to award a plaintiff the defendant's profits "subject to the principles of equity." 15 U.S.C. § 1117(a). Defendants argue that the district

court incorrectly determined that disgorgement is equitable under the *Pebble Beach* factors of willful infringement and lost or diverted sales. *See* 155 F.3d at 554 (citations omitted). We disagree. As discussed *supra*, the record supports the district court's finding that Defendants intended to trade on the goodwill of the TROJAN® brand and willfully infringed on the TROJAN® Marks. The record also supports the district court's finding that "Trojan Battery may have already lost sales or be at risk of having sales diverted based on the likelihood of confusion." And as Trojan Battery argues, evidence of diverted sales is not necessary for a district court to award disgorgement under the Lanham Act. *See Maltina Corp*, 613 F.2d at 585. Finally, the district court considered "the inadequacy of other remedies and the public interest in making the misconduct unprofitable," concluding that they also weigh in Trojan Battery's favor. It appropriately awarded disgorgement to deter future infringement, explaining that a permanent injunction would likely not deter willful infringers like Defendants. *See Maltina Corp.*, 613 F.2d at 585. Therefore, the district court did not abuse its discretion in determining that disgorgement was warranted.

### 2. Calculation of Disgorgement Award

The district court did not abuse its discretion in calculating the profits subject to disgorgement using the burden-shifting framework provided by the Lanham Act. Defendants argue that the disgorgement calculation was incorrect because the district court improperly allocated the burdens. We disagree.

### a. Plaintiff's Burden

As discussed *supra*, "the plaintiff shall be required to prove defendant's sales only." 15 U.S.C. § 1117(a). Here, Trojan Battery's expert estimated Defendants' sales of Trojan-EV branded golf carts during the relevant period, which the district court referenced in calculating the

disgorgement award. Therefore, the district court properly applied the first step of the burden-shifting framework under the Lanham Act.

### b. Defendants' Burden

Once a plaintiff proves a defendant's sales, the burden shifts to the defendant to prove "all elements of cost or deduction claimed." 15 U.S.C. § 1117(a). Here, the district court determined that Trojan EV had not "established that it is entitled to any deductions in the [c]ourt's calculation for 'mold fees' or 'total expenses.'" It also found that GCC had not "established that it is entitled to deductions in this calculation for 'shipping costs' of approximately \$975/unit." In other words, it concluded that Defendants had not met their burden of proving costs and deductions. While it was Defendants' burden to prove costs and deductions, the district court still accounted for the "relevant costs and deductions from [Defendants'] revenues established at trial under 15 U.S.C. § 1117(a)." Therefore, the district court properly applied the second step of the burden-shifting framework under the Lanham Act.

Defendants argue that the district court erred in applying the second step of the burden-shifting framework by shifting the burden of proving that profits are attributable to infringement solely to them. They contend that the district court's approach was inconsistent with Fifth Circuit precedent, primarily relying on *Texas Pig Stands*. There, Texas Pig Stands, Inc. ("TPS") sued Hard Rock Café International, Inc. ("Hard Rock") for infringing its trademark of the term "pig sandwich." *Tex. Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*, 951 F.2d 684, 687 (5th Cir. 1992) ("*Texas Pig Stands I*"). After a jury determined that Hard Rock willfully infringed on TPS' trademark, the district court declined to award Hard Rock's profits to TPS. *Id.* at 689. TPS closed its restaurants in Dallas before Hard Rock entered the market, so this

26

court concluded that Hard Rock could not have traded on TPS' goodwill where none existed. *Id.* at 696.

Here, unlike the facts in *Texas Pig Stands I*, the facts support an inference that the profits Defendants received from the sale of Trojan-EV golf carts are attributable to their infringement of the TROJAN® Marks. Given the market share of TROJAN® batteries and their recognition in the golf industry, the record shows that there is considerable goodwill in the TROJAN® brand. Furthermore, this court recognized that its decision in *Texas Pig Stands I* is consistent with the Supreme Court's decision in *Mishawaka Rubber & Woolen Manufacturing Co.*, which states that it is the defendant's burden "to prove that his infringement had no cash value in sales made by him." *See Tex. Pig Stands, Inc. v. Hard Rock Café Int'l, Inc.*, 966 F.2d 956, 957–58 (5th Cir. 1992); *Mishawaka Rubber & Woolen Mfg. Co.*, 316 U.S. at 206–07. Therefore, the district court's profits award is consistent with *Texas Pig Stands I* and other controlling precedent.

In sum, the district court did not abuse its discretion in awarding Trojan Battery disgorgement of Defendants' profits and in applying the burden-shifting framework under 15 U.S.C. § 1117(a). It did not base its decision on erroneous factual findings or misapply the law. *See Bear Ranch*, 885 F.3d at 805 (citation omitted).

*C. Permanent Injunction*

"A permanent injunction is the usual and normal remedy once trademark infringement has been found in a final judgment." 4 *McCarthy*, *supra*, § 30:1. This court reviews a district court's decision to grant a permanent injunction for abuse of discretion. *See Westchester Media*, 214 F.3d at 671 (citing *Pebble Beach Co.*, 155 F.3d at 550). "As with injunctive relief generally, an equitable remedy for trademark infringement should be no broader than necessary to prevent the deception." *Id.* (citations omitted).

The scope of an injunction depends on several factors, including "the manner in which [a] plaintiff is harmed" and "the possible means by which that harm can be avoided." 4 *McCarthy*, *supra*, § 30:3. Moreover, "[t]he 'safe distance rule' is an equitable, discretionary policy that authorizes a court to require that an enjoined party keep a 'safe distance' away from the core of conduct prohibited in an injunction or consent decree." 4 *McCarthy*, *supra*, § 30:4.

The district court abused its discretion because it issued an overbroad permanent injunction. Among other things, the district court's order enjoins Defendants from

> (a) advertising, marketing, promoting, selling, offering for sale or authorizing any third party to advertise, market, promote, sell and offer for sale **any goods or services bearing the TROJAN® Marks or bearing any mark containing the word TROJAN as an element** or any other mark that is a counterfeit, copy, simulation, confusingly similar variation, or colorable imitation of the TROJAN® Marks, including but not limited to on Defendants' websites, social media pages, in print media or point of sale materials, on golf carts or low-speed electric vehicles, on signage, or otherwise associated with Defendants' businesses or golf carts . . .

In other words, the permanent injunction prohibits Defendants from using the TROJAN® Marks or "TROJAN" on any good or in connection with any service. The permanent injunction is overbroad because it covers products that are unrelated to golf carts and golf-cart batteries in outside markets where confusion is unlikely. *See All. for Good Gov't*, 901 F.3d at 513–14 (modifying an injunction because the defendant's use of its trade name did not create a likelihood of confusion with the plaintiff's trade name). As discussed *supra*, the likelihood of confusion between the TROJAN® Marks and TROJAN-EV Mark arises because the parties both use the word

"TROJAN" to market related products in the golf industry to the same customers through the same marketing channels. However, confusion between the parties' marks would be unlikely if Defendants were to use the word "TROJAN" to market unrelated products outside of the golf industry, especially given other famous uses of "Trojan," such as Trojan condoms and the University of Southern California Trojan mascot.

Moreover, it is unlikely that Defendants will retain the goodwill they have received from the TROJAN® brand outside of the market for golf carts. *See Conan Props.*, 752 F.2d at 155 (declining to issue a broad injunction where there was no likelihood that the defendant would retain any of the goodwill that it may have misappropriated from the plaintiff). And although the district court determined that Defendants willfully infringed the TROJAN® Marks, this case is unlike *Kentucky Fried Chicken Corp.* where this court held that a broad injunction was justified by the defendant's "history of improper behavior." 549 F.2d 368, 390 (5th Cir. 1977). Rather, the district court's finding of willful infringement was largely based on its determination that Nell's testimony was not credible. Therefore, contrary to Trojan Battery's argument, the "safe distance" rule does not justify a broad injunction in this case.

In sum, the district court abused its discretion in issuing the permanent injunction because it is overbroad. *See Westchester Media*, 214 F.3d at 671 (citations omitted). The permanent injunction should be narrowed in scope to apply only to products within the markets for golf carts and golf-cart batteries.

## III

For the foregoing reasons, we AFFIRM the district court's liability judgment and its disgorgement of profits award. However, we VACATE the permanent injunction and REMAND for further proceedings.